[No. H020849. Sixth Dist. Mar. 20, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JAIME LEDESMA ZEPEDA, Defendant and Appellant.

## COUNSEL

Philip M. Brooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Peggy S. Ruffra and Gregory A. Ott, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—Defendant Jaime Ledesma Zepeda appeals after conviction, by jury trial, of first degree murder. (Pen. Code, § 187.)[1] The jury found true an allegation that defendant used a firearm (§ 12022.5, subd. (a)(1)) and an allegation that he discharged a firearm and caused death (§ 12022.53, subd. (d)). The trial court sentenced him to a term of 25 years to life for the murder, with a consecutive term of 25 years to life for the firearm discharge allegation.

On appeal, defendant contends the trial court erred by: (1) admitting statements obtained from a wiretap on the telephone in his jail cell; (2) admitting expert opinion testimony about his motive for the shooting; (3) instructing the jury to stop deliberating if it could not reach a unanimous verdict as to first degree murder (CALJIC No. 8.75); and (4) admitting evidence that defendant was involved in a prior gang-related shooting. Defendant also contends that the 25-year-to-life sentence imposed for the firearm discharge allegation constitutes cruel and unusual punishment. We will affirm the judgment.

---

[1]Unspecified section references are to the Penal Code.

Defendant has also filed a petition for writ of habeas corpus, which we agreed to consider with this appeal. We have disposed of that petition by way of separate order filed this date.

## BACKGROUND

On March 4, 1999, defendant shot and killed 18-year-old George Ortiz in front of 1127 Pacific Avenue in Salinas. Defendant was associated with a Sureño gang, while the victim, Ortiz, was associated with a Norteño gang.

Edward Hernandez lived at 1127 Pacific Avenue. On the day of the shooting, Ortiz had come over for a barbecue. At some point, Hernandez's nephew reported seeing someone in a hood across the street. Ortiz went to look.

Maurice Williams saw Ortiz walking down the street. He saw a Hispanic male wearing a blue Dallas Cowboys cap drive up in a green car. The driver asked Ortiz "if he knew some guy." Ortiz said he did not.

Williams asked Ortiz "who was that[?]" Ortiz said he did not know. The driver then backed up the green car and spoke to Ortiz again, asking him, "where are you from?" The driver fired several shots at Ortiz and sped away.

Ortiz stumbled back to 1127 Pacific Avenue, where he fell facedown. He had been struck by one of the bullets. It had entered his chest and exited his back. The bullet perforated his lung and heart, and it tore his aorta and esophagus.

Police discovered that the green car used in the shooting belonged to Ferris Ammadi. Ammadi and defendant both resided in Amicus House, a drug and alcohol recovery center. On the day of the shooting, Ammadi had given the car to defendant, who was going to detail it while Ammadi was at work. Defendant had possession of the car from about 9:00 a.m. until 9:00 p.m. When he returned the car to Ammadi, it had been detailed as promised.

On March 8, 1999 (four days after the shooting), the police examined Ammadi's car. They found one shell casing inside the car and another under the hood.

On March 19, 1999, the police arrested defendant for a parole violation. At the time, defendant was in his own car, a blue Mazda. Inside the hood of the car, the police discovered a nine-millimeter semiautomatic handgun. They found a blue Dallas Cowboys cap inside the car. A newspaper article

about the shooting was in the glove box. When the police searched defendant's room at Amicus House, they discovered another newspaper article about the shooting in his dresser drawer.

Ballistics tests subsequently revealed that the shell casings found in Ammadi's car had come from the nine-millimeter handgun discovered in defendant's car. Tests further revealed that the bullets found at the scene of the shooting had been fired from that gun.

On May 24, 1999, defendant was transported from the Santa Clara County Jail to the Monterey County Jail. A wiretap had been installed on the telephone in the cell where defendant was to be housed. That day, defendant called his girlfriend, Jackie Garcia, and instructed her to pick up the car "because you know there is something wrong with the motor . . . ." He told her, "You have to get that shit out and fucking get it out of the car . . . ." He also instructed her to get rid of his cap. The following day, defendant gave similar instructions to Irma Garcia. Defendant subsequently had another conversation with Jackie Garcia, telling her to get someone else to "pull that shit out of the motor."

Defendant was charged, by information, with murder. (§ 187.) The information alleged that defendant used a firearm (§ 12022.5, subd. (a)(1)), that he discharged a firearm and caused death (§ 12022.53, subd. (d)), that he committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that he had one prior conviction that qualified as a "strike" (§ 1170.12). The criminal street gang and "strike" allegations were dismissed prior to trial.

Defendant moved to suppress the evidence obtained via the wiretap in his jail cell. (§ 1538.5.) He argued that the district attorney's application for the wiretap did not provide the basis for the necessity requirements of California's wiretap statute (§ 629.52, subd. (d)) or the federal wiretap statute (18 U.S.C. § 2518(3)(c)). The trial court denied the motion to suppress, finding that the wiretap application did meet the necessity requirement.

The prosecution moved, in limine, to admit evidence that defendant had participated in a prior gang-related shooting. The prosecution argued the evidence was admissible to show motive and intent under Evidence Code section 1101, subdivision (b), and the trial court agreed.

The jury convicted defendant of first degree murder (§ 187) and found true the allegations of firearm use (§ 12022.5, subd. (a)(1)) and firearm discharge causing death (§ 12022.53, subd. (d)).

Prior to sentencing, defendant moved to strike the firearm discharge enhancement, arguing that imposition of the 25-year-to-life term specified in section 12022.53, subdivision (d) would amount to cruel and unusual punishment. The trial court denied the motion and sentenced defendant to a term of 25 years to life for the murder, with a consecutive term of 25 years to life for the firearm discharge enhancement.

## DISCUSSION

### Admission of Statements Obtained from Wiretap

Defendant contends the trial court erred by denying his motion to suppress the evidence obtained via the wiretap installed in his jail cell. As noted above, defendant argued in the trial court that the statements he made on the telephone in his jail cell should be suppressed because the district attorney's application for the wiretap did not provide the basis for the necessity requirements of California's wiretap statute (§ 629.52, subd. (d)) or the federal wiretap statute (18 U.S.C. § 2518(3)(c)). The trial court denied the motion to suppress, ruling that the technical requirements of the wiretap statutes were followed.

The trial court made the following findings: "I think it is unreasonable to require, for example, in this case that the defendant be interrogated before they seek a wire tap because obviously one of the things they're anticipating is that they have evidence and information that the defendant is unaware that they have and will—will have an interest in suppressing the wire tap. The wire tap will reveal that that's going on, and obviously it will be incriminating. [¶] Obviously if they're interrogating him, they're going to tip their hand. They have to tell him what kind of evidence they have which might encourage him to confess. [¶] Under the circumstances, if he decides he's not talking, they have tipped their hand and are not going to get that evidence. I think it is unreasonable to require that in the situation. The Court therefore denies the motion [to suppress]."

■ Generally, when reviewing a motion to suppress evidence, "we must accept the trial court's resolution of disputed facts and its assessment of credibility [citation], but, the issue whether, under the facts found, a seizure or search was unreasonable is a question of law, as to which the appellate court is bound to exercise its independent judgment. [Citations.]" (*People v. Valenzuela* (1994) 28 Cal.App.4th 817, 823 [33 Cal.Rptr.2d 802].)

### Fourth Amendment

■ Defendant claims that the wiretap violated the Fourth Amendment of the federal Constitution. (U.S. Const., 4th Amend.) By failing to raise this

claim below, he waived it. (*People v. Turner* (1994) 8 Cal.4th 137, 176-177 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People v. Saunders* (1993) 5 Cal.4th 580, 590 [20 Cal.Rptr.2d 638, 853 P.2d 1093].) In any event, the claim lacks merit.

The Fourth Amendment ensures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." (U.S. Const., 4th Amend.) However, this protection does not extend to a jail cell. "[T]o say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. . . . [I]t is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." (*Lanza v. New York* (1961) 370 U.S. 139, 143 [82 S.Ct. 1218, 1220-1221, 8 L.Ed.2d 384].)

In *Hudson v. Palmer* (1984) 468 U.S. 517 [104 S.Ct. 3194, 82 L.Ed.2d 393], the United States Supreme Court upheld a random search of an inmate's prison cell, concluding that the Fourth Amendment's proscription against unreasonable searches and seizures was not applicable because an inmate has no reasonable expectation of privacy in his or her cell. (*Id.* at p. 526 [104 S.Ct. at p. 3200].) In *U.S. v. Van Poyck* (9th Cir. 1996) 77 F.3d 285, the Ninth Circuit held that "any expectation of privacy in outbound calls from prison is not objectively reasonable and that the Fourth Amendment is therefore not triggered by the routine taping of such calls." (*Id.* at p. 291; see also *United States v. Paul* (6th Cir. 1980) 614 F.2d 115, 116; *United States v. Hearst* (9th Cir. 1977) 563 F.2d 1331, 1345; *Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 27 [196 Cal.Rptr. 704, 672 P.2d 110] [recognizing that "under settled federal precedent . . . , the secret monitoring and recording of unprivileged conversations in prisons, jails, and police stations" does not constitute an unlawful search].)

Despite the above cited authority, defendant maintains that pretrial detainees have a reasonable expectation of privacy in jail communications. However, the cases defendant cites do not rest on the Fourth Amendment. Rather, those cases discuss the right to privacy provided to inmates by sections 2600 and 2601.[2] (*People v. Champion* (1995) 9 Cal.4th 879, 912 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *De Lancie v. Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]; *People v. Elwood* (1988) 199 Cal.App.3d 1365

---

[2]Section 2600 provides that "[a] person sentenced to imprisonment in the state prison may during that period of confinement be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests."

[245 Cal.Rptr. 585].) While those statutes prohibit the recording of jail communications for the purpose of gathering evidence—but allow recordings done to protect institutional security (*De Lancie v. Superior Court, supra,* 31 Cal.3d 865)—"federal law does not make that distinction." (*People v. Riel* (2000) 22 Cal.4th 1153, 1184 [96 Cal.Rptr.2d 1, 998 P.2d 969] [rejecting Fourth Amendment challenge to surreptitious recording of inmate's conversation in jail visiting room].) Moreover, the state right to privacy does not help defendant. "In general, relevant evidence that is illegally obtained under California law is nonetheless admissible, so long as federal law does not bar its admission. [Citations.]" (*People v. Hines* (1997) 15 Cal.4th 997, 1043-1044 [64 Cal.Rptr.2d 594, 938 P.2d 388] [Fourth Amendment does not require suppression of inmate's conversation recorded in holding cell].)

As defendant had no reasonable expectation of privacy in his jail cell (*Lanza v. New York, supra,* 370 U.S. at p. 143 [82 S.Ct. at pp. 1220-1221]; *Hudson v. Palmer, supra,* 468 U.S. at p. 526 [104 S.Ct. at p. 3200]; *U.S. v. Van Poyck, supra,* 77 F.3d at p. 291), the wiretap on his telephone did not violate the Fourth Amendment to the federal Constitution.

### Fifth Amendment

Defendant claims that the wiretap violated his Fifth Amendment privilege against self-incrimination. (U.S. Const., 5th Amend.) Again, he waived this claim by failing to present it below. (*People v. Crittenden* (1994) 9 Cal.4th 83, 126-127 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Saunders, supra,* 5 Cal.4th at p. 590.) And again, the claim lacks merit.

In *People v. Webb* (1993) 6 Cal.4th 494 [24 Cal.Rptr.2d 779, 862 P.2d 779], the defendant argued that the admission of tape-recorded conversations he had with his girlfriend while he was in jail violated his Fifth Amendment privilege against self-incrimination. The California Supreme Court rejected the argument, noting that the defendant's recorded statements "were not the product of 'custodial interrogation' " nor the product of police coercion. (*Id.* at p. 526, quoting *Miranda v. Arizona* (1966) 384 U.S. 436, 444 [86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 10 A.L.R.3d 974]; see also *Illinois v. Perkins* (1990) 496 U.S. 292, 296-297 [110 S.Ct. 2394, 2396-2398, 110 L.Ed.2d 243].)

Section 2601 enumerates the civil rights of persons sentenced to imprisonment in the state prison, which include: the right to inherit, own, sell, or convey real or personal property; the right to confidential correspondence with an attorney; the right to purchase, receive, and read certain newspapers, periodicals, and books; the right to initiate civil actions; the right to marry; the right to create a power of appointment; the right to make a will; and the right to receive certain benefits under the Labor Code and section 5069.

Here, as in *Webb*, defendant's recorded statements were "completely voluntary and compulsion-free." (*People v. Webb, supra*, 6 Cal.4th at p. 526.) Therefore, the admission of the statements obtained through the wiretap did not violate the Fifth Amendment.

*Wiretapping Statute*

 Defendant contends that the application for a wiretap did not comply with the statutory requirements set forth in section 629.52.[3] We begin by describing California's statutory wiretapping scheme.

In general, California law prohibits wiretapping. (§ 631.) However, under section 629.50 et seq., a judge may issue an order approving a wiretap. A district attorney may present a wiretap application to a judge. (§ 629.50.) The judge may authorize a wiretap only if he or she makes the following determinations based on the district attorney's application. First, that there is probable cause to believe that an individual has committed a specified offense, such as murder. (§ 629.52, subd. (a)(2).) Second, that there is probable cause to believe that communications regarding the offense will be obtained through the wiretap. (§ 629.52, subd. (b).) Third, that there is probable cause to believe that the particular facility where the wiretap is to be installed will be used by the person whose communications are to be intercepted. (§ 629.52, subd. (c).) Finally, there is a "necessity" requirement: that "[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous." (§ 629.52, subd. (d).)

Prior to the enactment of section 629.50 et seq., the California wiretapping statutes (former § 629 et seq.) did not permit the interception of oral or electronic communications, and they permitted wiretapping only during the

---

[3]Section 629.52 provides: "Upon application made under Section 629.50, the judge may enter an ex parte order, as requested or modified, authorizing interception of wire, electronic digital pager, or electronic cellular telephone communications initially intercepted within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines, on the basis of the facts submitted by the applicant, all of the following: [¶] (a) There is probable cause to believe that an individual is committing, has committed, or is about to commit, one of the following offenses: [¶] . . . [¶] (2) Murder . . . . [¶] . . . [¶] (b) There is probable cause to believe that particular communications concerning the illegal activities will be obtained through that interception . . . . [¶] (c) There is probable cause to believe that the facilities from which, or the place where, the wire, electronic digital pager, or electronic cellular telephone communications are to be intercepted are being used, or are about to be used, in connection with the commission of the offense, or are leased to, listed in the name of, or commonly used by the person whose communications are to be intercepted. [¶] (d) Normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous."

investigation into certain offenses involving controlled substances. The Legislature enacted section 629.50 et seq. in 1995, in order "to expand California wiretap law to conform to the federal law." (Sen. Com. on Crim. Proc., Rep. on Assem. Bill No. 1016 (1995-1996 Reg. Sess.) as amended Apr. 3, 1995.)

The federal law regarding wiretaps is contained in title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 United States Code sections 2510-2520. Like section 629.52, the federal statute contains a "necessity" requirement. A judge may approve a wiretap only if the application contains facts to support a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." (18 U.S.C. § 2518(3)(c); see *U.S. v. Carneiro* (9th Cir. 1988) 861 F.2d 1171, 1176.)

Here, the district attorney's application for a wiretap was supported by an affidavit from Detective Kenneth Wynne, executed on March 23, 1999. In his affidavit, Detective Wynne first described his training and experience. He then described the shooting and the investigation, as follows:

"On Thursday, March 4, 1999 at approximately 1536 hour, Detective Roecker and your declarant were assigned to investigate the shooting death of a Hispanic male, which occurred outside of 1127 Pacific Avenue.

"The deceased victim was shot once in the chest near the driveway area of 1127 Pacific Avenue. The victim was transported to Natividad Medical Center by ambulance and later died at this location. Monterey County Coroner Pathologist Dr. Walker later identified the cause of death as a penetrating gunshot wound to the chest.

"The victim was identified as George Ortiz, age 18. Based on your declarant's analysis of Ortiz' personal history with the police department, gang photographs depicting Ortiz and Ortiz' admissions to other officers, I believe Ortiz to have been strongly associated with Norteno street gangs.

"Detective Roecker and your declarant interviewed witnesses near 1127 Pacific Avenue. Witnesses said the victim was standing near 1127 Pacific Avenue when a dark green or black possible Mitsubishi Galant, 2 door sedan with 'Star' type chrome rims stopped in front of this location. The victim and driver of the vehicle exchanged words. The driver fired 3-4 gunshots at the victim, then accelerated northbound on Pacific Avenue. There were two witnesses initially. Neither person has a criminal history. Both appeared to be willing to provide information as good citizens and not in exchange for

money or favors from law enforcement. Each provided information about what he/she had personally seen of the shooting. One of the witnesses saw the driver of the suspect vehicle extended his arm out of the driver's window. The witness than heard the sound of gunshots but did not see a gun. Based on the witnesses' description of the shooting and the path of the suspect vehicle as well as the position of Ortiz' body, your declarant could tell that Ortiz had to be outside the driver's side of the suspect vehicle at the time of the shooting. The location of the two bullets found at the scene were also consistent with shots fired from the driver's window.

"The two witnesses described the driver of the suspect vehicle as a medium complected Hispanic male with a mustache, having short shiny hair combed back. He was wearing a white T-shirt, black pants, and had a wristwatch on his right wrist.

"The Salinas Police Department Crime Scene Unit processed the crime scene, which resulted in retrieving two full metal-jacketed bullets. Detective Roecker was shown these bullets and it is his opinion that they are a 9mm caliber round. Detective Roecker is qualified to identify the caliber of an expended bullet based on his experience reloading ammunition, competitive shooting and police work. Your declarant also saw these bullets and believes them to be consistent with 9 mm rounds I have seen in the past.

"On Sunday, March 7, 1999 at 1600 hours, your declarant met with Detective Roecker at the Salinas Police Department. Your declarant had received two telephone voice messages, which were saved, transcribed and is [sic] as follows.

" 'Hi Detective. I got information for you about the murder that took place in Salinas on Thursday at four in the afternoon. I know who did it, I know who's car the car that he used and everything else it wasn't his car. I would like to speak to you in person and I would like to remain anonymous. What time is it, it is 2:35 P.M. right now and I will call you back at 3:00 P.M. all right. Thanks.'

" 'Hi. I have information on the murder that took place on Thursday afternoon around 4:00 P.M. The vehicle used is a Mazda Millennium, a dark green Mazda Millennium with those chrome rims that you spoke of. License plate number is 4DFU827. It's registered to a Fariborz Ammadi. He's not the one that did the shooting; he was having his car detailed that day. But he happens to live in a recovery program with a person who was detailing his car. One of his roommates from Salinas who just got ou[t] of he is a CYA kid. He is [in] a recovery program with the owner of the vehicle. The owner

of the vehicle had nothing to do with it, he wasn't even in the car, and he was at work. He sells cars at Bob Lewis Volkswagen on Capital Expressway in San Jose and he was at work that day. But the one that did do this crime was Jaime Ledezma Zepeda; he goes by either last name Zepeda. I would like to remain anonymous but what was the motive, I don't know. I think it was a gang thing. Jaime Zepeda has been in the youth authority for four and a half years for attempted murder for gang shooting. He's got a real good Parole Officer Charles Dennis is his name in San Jose. But that's the information I give Detective Ken Wynne a call tomorrow to make sure he gets all this information. Yes, but that's the deal all right, sorry it happened, but hopefully you can do something about it. Thank you.'

"On Monday, March 8, 1999, your declarant received a telephone call from a male requesting to remain anonymous. The conversation was tape recorded and transcribed.

"The caller told your declarant that he had more information in regards to the murder. The male said that the shooter, Zepeda, as well as the owner of the vehicle used in this crime live at 28 South 13th Street in the city of San Jose. The caller said the car was currently sitting on a car lot in San Jose. The caller said that the car was at Wheels and Deals at 2585 El Camino Real, phone number of 246-1000. The caller stated that the key number to ask for the car was D-8.

"Your declarant asked the caller how he knew that Zepeda had shot someone in Salinas. The caller said that Zepeda had told one of the persons in the house and that person had contacted him. The caller said that he then checked the sign out sheet for the day of the homicide, being Thursday March 4th 1999. The caller said that he found that Zepeda had signed out at 12:30 p.m. and signed back in at 3:00 p.m. The caller said that he knew this was a lie and that Zepeda had returned back at 6:15 p.m. The caller then told your declarant that he had changed the sign out sheet to the correct time and initialed it. The caller said that he had been checking the rooms on Sunday morning and saw a newspaper clipping about this homicide on Zepeda's dresser. The caller said that this is how he got your declarant's phone number. Your declarant asked the male if he was a counselor or someone who was in charge of the house and the caller said yes.

"The caller said that every night they do a [w]rap-up at the house and every one is given a chance to comment on their day. The caller said on Thursday, the day of the homicide, at the [w]rap-up, Zepeda was not in 'good shape'. Zepeda said that he had had a 'paranoid afternoon'. Zepeda told the group that if anyone called looking for him that he didn't live there.

The caller said that Zepeda had been at the house for 3 to 4 months and had been doing well. The caller said that Zepeda had received a lot of credit cards and was buying jewelry. Your declarant asked the caller if Zepeda had purchased a new watch and the caller said Zepeda had purchased a real expensive watch.

"Your declarant asked the caller to describe Zepeda and the caller said that Zepeda looks the same, but that he had a baseball hat on. The caller said Zepeda always has a baseball hat on.

"At the conclusion of this telephone conversation, Detective Roecker and your declarant proceeded to the Wheels and Deals automotive car lot, located at 2585 El Camino Real, Santa Clara, CA.

"Your declarant and Detective Roecker located the dark green 1995 Mazda Millennium bearing California license plate 4DFU827 at this location. Your declarant requested the sales representative open the hood of the vehicle. We located two spent CCI Blazer 9mm shell casings, one near the passenger side support arm and the other near the driver's side support arm. A blue pen was also located near the passenger support arm.

"The location of the two expended casings in the well housing the windshield wipers and air vent intakes would be consistent with a person holding a semiautomatic pistol outside the driver's window and firing the weapon. The expended casings on most semiautomatic pistols are ejected up and back and to the right. This would land the expended casings on the roof or windshield of the vehicle. From there, they could roll down into the well.

"Both casings and pen were retrieved for evidentiary purposes and placed into evidence at the Salinas Police Department.

"The caller told your declarant that the registered owner of the Mazda Millennium was Fariborz Ammadi and that the vehicle was at the Wheels and Deals car lot in Santa Clara. The caller also said that Ammadi lives at the Amicus House with Jaime Zapeda and works at Bob Lewis Volkswagen on Capital Expressway in San Jose.

"Detective Roecker and your declarant verified the callers' information that Ammadi's vehicle was at Wheels and Deals in Santa Clara, as well as confirming that Ammadi is a salesman at Bob Lewis Volkswagen dealership in San Jose.

"Detective Roecker contacted the San Jose Police Department Records Unit regarding Fariborz Ammadi. Their information reflects Ammadi is a narcotics registrant with a listed address of 28 S. 13th Street, San Jose, CA.

"Detective Roecker and your declarant had the occasion to view a 1995 Mitsubishi Galant and a 1995 Mazda Millenia. They both appear to have a similar type of body contour and style.

"On Tuesday, March 9, 1999 at 0900 hours, Detective Roecker and your declarant contacted a witness regarding this incident. This third witness likewise does not have a criminal history. The witness provided information without requesting financial compensation and without requesting favors. The witness is not the subject of any pending investigation or court case. The witness provided the information as a good citizen to help law enforcement solve a homicide. During the course of the interview, he/she told us that the suspect vehicle was dark green in color. He/she said that the driver/solo occupant was described as a Hispanic male wearing a Dallas Cowboys baseball style hat. The witness described where he/she was at the time of the shooting. Based on your declarant's knowledge of the scene, the witness would have had a near-ideal position to view the crime.

"Around 1600 hours, Detective Roecker telephoned Mr. Luis Lizarraga, who is a State Parole Officer working in the San Jose field office. He was faxed a 16 page State of California, Department of the Youth Authority document related to Jaime Zepeda.

"The documents reflect that Zepeda was released from the California Youth Authority on October 20, 1998 and transferred to the Amicus House Inc., 28 S.13th Street, San Jose, CA. This location is a transition house for individuals that have been released from prison.

"Jaime Zepeda is currently on parole and is scheduled to be discharged on November 29, 2003.

"On Friday, March 19, 1999, Jaime Zepeda's Parole Agent, Charles Dennis arrested him for violation of section 3056PC/Violation of Parole for violations committed in the San Jose area and not related to any facts surrounding this investigation. Members from the California Youth Authority Parole Unit, San Jose Police Department, Detective Roecker and your declarant conducted a parole search of Zepeda's vehicle and residence in the City of San Jose.

"As a result of searching Zepeda's 1991 light blue, Mazda Protégé, 4-door sedan, bearing California license 2WUD900, a loaded Smith & Wesson, Model 39-2, 9mm semi-automatic handgun was located in the engine compartment and a cellular telephone located attached to the drivers visor. The ammunition in the magazine included several rounds of CCI 9mm ammunition. The casings of this brand were aluminum. This is significant because

the two expended casings recovered from the vehicle at the car lot were also CCI 9mm aluminum casings. A newspaper article of the homicide and a DMV 'Bill of Sale', Certificate of Title listing Jaime Zepeda and Jackie Garcia Montelongo as the new owners of the vehicle was located in the glove box compartment. A Dallas Cowboy's baseball hat was also located on the rear passenger seat area.

"At the conclusion of the vehicle search, Detective Roecker, declarant and the parole officers proceeded to Zepeda's residence where a second search was conducted. At the residence, we met with house manager, Tom Arnold. Mr. Arnold walked us to the room where he pointed out the bed and dresser that belonged to Zepeda. Items located within the dresser area belonging to Zepeda included a second newspaper article from the Salinas Californian of the homicide, a GTE Wireless telephone bill, account # (408) 205-2292, a silver colored men's Timex Indiglo watch, and additional DMV paperwork regarding transferring ownership of the vehicle in which the weapon was located to Zepeda and Montelongo.

"While at Amicus House, your declarant took custody of the sign-in/sign-out log for March 4, 1999. The log showed that a person named Jaime signed out at 12:30 with an expected return of 6:00. The time in is initially written as 3:00. That time is crossed out. Next to it was apparently written '6:15 actually TA.' The '6' has been, in turn, written over with a '5' to finally read '5:15.' Tom Arnold is a counselor at Amicus House.

"On Monday, March 22, 1999 Detective Roecker and your declarant contacted the registered owner of the vehicle used in the homicide, Ferris Ammadi at his place of employment.

"Ammadi agreed to pay Jaime Zepeda $45.00 for the purpose of detailing his vehicle on Thursday, March 4, 1999. Ammadi told Zepeda that the key to the vehicle would be left on the dresser. Ammadi left for work at approximately 0900 hours and returned around 2100 hours that night, where Ammadi retrieved his car keys from Zepeda.

"Detective Roecker and your declarant transported the weapon, ammunition, spent casings and bullets to the Santa Clara County District Attorneys Crime Laboratory in the City of San Jose for ballistic comparison and analysis.

"Detective Roecker is in the process of completing search warrants for telephone records from both the Amicus House and Zepeda's cellular phone.

"Jaime Zepeda has an arrest history with the Salinas Police Department and a subsequent juvenile and criminal court record. On 06-09-94, Zepeda

was arrested and interviewed by Detective Tim McLaughlin of the Salinas Police Department about an attempted murder. Zepeda admitted his involvement and pled to the crime in court. This is covered in report 94-060498. He was sentenced for violation of section(s) 245(a)(2) PC and 12022.5PC on 07-08-94 to the California Youth Authority for a period of four and a half years. This shooting involved Zepeda firing at Norteno gang members but striking a school crossing guard instead.

"Jaime Ledezma Zepeda Jr. is currently 20 years of age and his physical description is 5'8", 190 pounds, with black hair and brown eyes. Zepeda is certified by the SPD Gang Intelligence Unit as a Sureno 'Vagos' gang member.

"Your declarant knows from working the streets of Salinas for many years that Surenos and Nortenos are bitter enemies. When the opportunity arises, either side will attack the other with any means convenient, including firearms.

"Zepeda was living at the Amicus House, 28 S. 13th Street in the City of San Jose until his arrest on Friday, March 21, 1999. The following resources confirmed Jaime Zepeda's residency: his California I.D. card (CID # B9890006 as of 12-10-98) and a State of California, Department of the [Y]outh Authority document reflecting this address as of 10-20-98.

"The following telephone number has been confirmed at 1420 Natividad Road, Salinas, California: Monterey County jail station number 0164. This is the telephone for the isolation cell at the Monterey County jail. Zepeda, when placed in custody at the jail, will be placed in isolation because of his association with Sureno street gangs and because of his past charge and current charge of shooting at Nortenos. This is standard placement at the jail to protect persons like Zepeda who would otherwise be the targets of retribution from Nortenos who make up a large portion of jail inmates. In isolation, Zepeda will have daily access of up to one hour to this telephone.

"Jaime Zepeda is unaware that a pistol, cap and news clipping were seized from his vehicle. His is also unaware that a news clipping concerning the homicide was seized from his room. I believe that Jaime Zepeda has additional information concerning the commission of the murder of George Ortiz. Your declarant believes that Jaime Zepeda communicates with his associates on a regular basis on the telephone and is likely to discuss his involvement in the murder of George Ortiz with other persons. These discussions are likely to take place on the telephone number I am requesting to intercept. Your declarant expects that the conversation will involve

Zepeda alerting his associates to the investigation and designing cover stories for possible future contacts by the police department. Zepeda will also alert his Sureno associates to the location of the pistol, cap and news clippings to seek their assistance in hiding this evidence.

"The plan of the investigation is to contact Zepeda and arrest him for violation of section(s) 3056PC and 187PC. The parole violation is related to Detective Roecker and Corporal Kimm's contact with Zepeda on 02-05-99 in which he was the driver of a motor vehicle with two known Vagos Sureno gang members. Zepeda was issued City of Salina citation #194787 for violation of Section(s) 24250CVC/Driving without headlights, 12500(a) CVC/Driver unlicensed and 16028(a) CVC/No proof of financial responsibility. Zepeda's conditions of parole include not to knowingly associate with gang members and not to drive a motor vehicle unless he has a valid driver's license and insurance. Your declarant believes this contact with Zepeda will trigger a call to his associates to alert him about the police contact. Your declarant expects that the nature of the conversation will be the same: they will discuss the crime, what the police know, how they should react and where the evidence is.

"Your declarant believes that the officers in this investigation should need no more than one week to make all these contacts and seeks to have the order authorizing the interception of the wire communications last until the described communications have been made or seven days, whichever occurs first.

"Your declarant has obtained the assistance of the California Department of Justice to execute the order to intercept wire communications at the Monterey County jail facility. Specifically, the Technical Operations Unit of DOJ will provide the equipment needed to comply with Penal Code Section 629.50 et seq. That Unit will also give technical assistance for the hook up.

"Your declarant will need the assistance of Pacific Bell Telephone Co. to execute an order to intercept because it is the utility, which provides telephone service to the Monterey County Jail. Your declarant also wishes an order that Pacific Bell Telephone Co. not disclose this intercept except in compliance with any order of the Court.

"The devices that DOJ will provide are able both to intercept the wire communications and to identify the number called from Monterey County jail station number 0164. This jail telephone does not have a normal telephone number because it may be used only to place calls, not to receive them.

"Your declarant believes that conventional law enforcement techniques will not take us any further in the investigation of George Ortiz' murder. Your declarant's experience with persons who have served time in institutions such as state prison or CYA is that they are very unlikely to make statements to police officers. While your declarant intends to interrogate Zepeda on his arrest for the murder of Ortiz, your declarant does not expect Zepeda to cooperate during the questioning.

"Your declarant does not know of any application previously made to a judge of a state or federal court for authorization to intercept wire, electronic digital pager, or electronic cellular telephone communications involving Jaime Zepeda or the telephone identified as Monterey County jail station number 0164 located at the Monterey County jail facility, 1420 Natividad Road, Salinas, California."

Defendant contends that here, the application for the wiretap did not support a finding that "[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous." (§ 629.52, subd. (d).) As no published California case has yet to address the "necessity" requirement of section 629.52, subdivision (d), we turn to the federal case law for direction.

Because section 629.52, subdivision (d), like 18 United States Code section 2518(3)(c), is "worded in the disjunctive, the government may establish the need for a wiretap by showing *either* (i) that normal investigative procedures have been tried and failed, *or* (ii) that normal investigative procedures, though not yet tried, 'reasonably appear' to be either 'unlikely to succeed if tried' or 'too dangerous.' [Citation.] In reality, this gives the government three alternative ways to establish the need for a wiretap." (*U.S. v. Smith* (4th Cir. 1994) 31 F.3d 1294, 1298, fn. 2, original italics.)

■ The trial court's determination that the "necessity" requirement was met is reviewed for abuse of discretion. (See *U.S. v. Bennett* (9th Cir. 2000) 219 F.3d 1117, 1121; *U.S. v. Carneiro, supra,* 861 F.2d at p. 1176.)

■ Defendant asserts that Detective Wynne's affidavit showed that normal investigative procedures had been successful in producing evidence connecting defendant to the murder. However, as the federal cases have recognized, "[w]hat amount of evidence will be sufficient to obtain a conviction is an imprecise concept." (*U.S. v. Nixon* (11th Cir. 1990) 918 F.2d 895, 901.) In *Nixon*, the police had gathered substantial evidence of a crack cocaine distribution ring involving four defendants at the time they applied for a wiretap. Undercover agents had arranged for and made crack cocaine

purchases from the defendants. Two of the defendants had been found with a large amount of cash at an airport, with tickets under fictitious names. Purchases of crack cocaine had been made at a confectionery business run by a third defendant; a search of the business had revealed a large amount of cocaine, weapons, and ammunition. There was evidence of phone calls between the defendants and known drug dealers, and evidence of "substantial narcotics-related activity" from the home of two defendants. (*Id.* at p. 900.) The four defendants were known to control "a highly suspicious quantity and quality of known real and personal property." (*Ibid.*) On appeal, the defendants argued that the wiretap was unnecessary because the government had already obtained sufficient evidence to secure convictions. The court rejected the contention, explaining that "upon a review of the record we cannot say that the magistrate erred in concluding that alternative investigative techniques neither had succeeded, nor would succeed, in providing enough evidence to prove the conspirators' guilt beyond a reasonable doubt." (*Id.* at p. 901.)

Here, too, we cannot say that the judge who reviewed the wiretap application erred by concluding that "[n]ormal investigative procedures have been tried and have failed" (§ 629.52, subd. (d)) to provide enough evidence to prove defendant's guilt beyond a reasonable doubt. The police were investigating an apparent gang-related murder committed by means of a drive-by shooting. The eyewitnesses had provided very general descriptions of the shooter that were insufficient to identify the perpetrator. The information that ultimately connected defendant to the crime came from telephone callers who indicated they wanted to remain anonymous. The evidence gathered pursuant to the anonymous telephone calls produced only a circumstantial case against defendant. The car used in the shooting had been used by defendant on the day of the shooting, but it did not belong to defendant. The baseball cap and newspaper articles found in defendant's car and at his apartment indicated defendant may have had some connection with the shooting, but they did not constitute strong evidence of defendant's guilt. A nine-millimeter handgun had been found in defendant's car, but even ballistics tests, which were in progress, would not have determined whether or not defendant himself had fired the gun at Ortiz. In sum, "[n]ormal investigative procedures" had produced a case against defendant that was far from overwhelming. (§ 629.52, subd. (d).)

Defendant also argues that the wiretap was not justified by the fact that he was likely to invoke his Fifth Amendment privilege against self-incrimination. However, federal cases have upheld the issuance of wiretaps where the affidavit demonstrated that the questioning of witnesses (a traditional investigative technique) was unlikely to produce evidence in support of a conviction. For instance, in *United States v. Lambert* (6th Cir. 1985) 771 F.2d 83,

the defendant's housekeeper provided the FBI with evidence showing that the defendant was engaged in a cocaine distribution conspiracy. The evidence included cocaine, drug paraphernalia, phone bills, check stubs, and information about other persons involved in a basement meeting with the defendant. The court found that the necessity for a wiretap had been demonstrated by "the fact that alternative investigative procedures, such as directly questioning [the defendant] and his associates, would likely alert the subjects to the presence and scope of the investigation. This was sufficient to satisfy the government's obligation under [18 U.S.C.] § 2518(1)(c). [Citations.]" (*United States v. Lambert, supra,* 771 F.2d at p. 91.)

Similarly, in *U.S. v. Bennett, supra,* 219 F.3d 1117, the authorities were attempting to gather evidence of a drug conspiracy. They had successfully used a paid informant to make several buys. In a declaration, the agent seeking the wiretap acknowledged that other investigative techniques were available, but were not likely to produce useful information. The agent asserted that "[s]uspect interviews, grand jury subpoenas, and search warrants would also alert the suspects to the ongoing investigation." (*Id.* at p. 1122.) In upholding the issuance of the wiretap, the court noted that in order to meet the necessity requirement, the police need not pursue investigative techniques "to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope." (*Ibid.*) The court further explained that "the mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap. [Citation.]" (*Ibid.*)

Here, Detective Wynne's affidavit stated that defendant was unlikely to cooperate with the police due to his prior experience with the criminal justice system. The affidavit explained that defendant was in custody on an unrelated parole violation and that he was unaware that the police had seized evidence from his vehicle and residence. It also explained that defendant was likely to alert his confederates and ask them to destroy additional evidence. This danger was significant, as defendant was a known gang member and the shooting was apparently gang related. Thus, despite the availability of questioning as a further investigative tool, the affidavit also sufficiently demonstrated that "[n]ormal investigative procedures" were "unlikely to succeed if tried." (§ 629.52, subd. (d); see *United States v. Lambert, supra,* 771 F.2d at p. 91; *U.S. v. Bennett, supra,* 219 F.3d at p. 1122.)

Federal cases have also found the necessity requirement met where the police obtained significant evidence from confidential or anonymous informants who were unwilling to testify at trial, because the case was not

provable under those circumstances. For instance, in *United States v. Alfonso* (5th Cir. 1977) 552 F.2d 605, confidential informants had provided police with details of an illegal gambling operation. However, all of the informants had refused to testify. The court concluded that "only wiretapping offered a 'reasonable likelihood' of securing evidence necessary to prove the gambling violations and to apprehend the top figures of the organization." (*Id.* at p. 611; see also *U.S. v. Khan* (9th Cir. 1993) 993 F.2d 1368, 1370, 1375; *U.S. v. Leisure* (8th Cir. 1988) 844 F.2d 1347, 1356.)

Here, the information connecting defendant to the crime came entirely from callers who wished to remain anonymous. Thus, it appeared that persons with information about the offense were afraid to come forward. In light of this demonstrated reluctance and because the offense appeared to be gang related, the police were likely to encounter difficulty finding people willing to testify against defendant at trial.[4]

To summarize, several factors supported the trial court's finding of necessity for the wiretap. The case against defendant was entirely circumstantial. It appeared that witnesses were reluctant to come forward other than in an anonymous manner. Detective Wynne believed that questioning defendant about the shooting was unlikely to produce any additional evidence. Defendant was unaware that he was the focus of the murder investigation and unaware that the police had seized evidence from his room and his vehicle. Detective Wynn believed that defendant was likely to alert others and ask them to destroy other evidence. Under the circumstances, the trial court could reasonably have found that the prosecution would have had a difficult time proving its case without evidence that could be obtained via a wiretap —in other words, that "[n]ormal investigative procedures have been tried and failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous." (§ 629.52, subd. (d).) Thus, we believe that the trial court did not abuse its discretion by finding that the necessity requirement of section 629.52 had been met. We conclude that the trial court properly denied defendant's motion to suppress the evidence obtained from the wiretap in defendant's jail cell.

### Admission of Opinion Testimony

■ Defendant contends the trial court erred by permitting the prosecution's gang expert, Officer Russ Hauschild, to give his "opinion as to why somebody would go to Pacific [Avenue] and ask a person where they were from and then shoot them . . . ."

---

[4]Indeed, the primary eyewitness, Maurice Williams, testified that he did not want to talk to the police about the shooting and that he did not want to come to court.

Officer Hauschild's response to the question follows: "[T]he primary reason would be for [defendant] to reestablish himself within the gang and perhaps reestablish the gang within the community by doing in this [*sic*] would bolster [defendant's] reputation within the gang. It would also outwardly give a clear message to the community and other rival gangs, gang members in his gang, that this individual is one that is not to be messed with. He means business. And what happens is this kind of grows, this evolves. What it does is show that [the] gang has power; they have got individuals who are willing to go out and commit violent acts against other individuals. It gives the gang power in the eyes of other individuals who are perhaps thinking about going to that gang. The more power the gang has, the more attractive it becomes to gang member prospects."

Defendant did not object to either the question or the answer. He now claims the testimony violated section 29, which prohibits expert testimony as to "whether the defendant had or did not have the required mental states . . . for the crimes charged." Although defendant made a general objection to the admission of gang evidence prior to trial, this was insufficient to preserve this claim. (Evid. Code, § 353; see *People v. Waidla* (2000) 22 Cal.4th 690, 717 [94 Cal.Rptr.2d 396, 996 P.2d 46].) In any event, the claim lacks merit.

"Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*Id.*, subd. (a).) The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713] (*Gardeley*).) "[A]n expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.]" (*Id.* at p. 618.)

In *Gardeley, supra,* 14 Cal.4th 605, the court approved the admission of similar expert testimony. There, the expert was given the facts of the case and asked, hypothetically, whether the described incident would be " 'gang-related activity.' " (*Id.* at p. 619.) The expert opined "that it was a 'classic' example of gang-related activity, explaining that criminal street gangs rely on such violent assaults to frighten the residents of an area where the gang members sell drugs, thereby securing the gang's drug-dealing stronghold." (*Ibid.*) Similar testimony was also approved in *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371 [37 Cal.Rptr.2d 596], and *People v. Valdez* (1997) 58 Cal.App.4th 494, 508-509 [68 Cal.Rptr.2d 135].)

Here, as in *Gardeley*, the prosecutor posed a hypothetical question based on the facts of this case: "why somebody would go to Pacific [Avenue] and

ask a person where they were from and then shoot them . . . ." The expert opined that such behavior, by a known gang member, was likely done for certain gang-related purposes. Under the authorities cited above, it was not error to admit such testimony.

*CALJIC No. 8.75*

■ Defendant contends the trial court erred by instructing the jury pursuant to CALJIC No. 8.75 (6th ed. 1997). His argument pertains to the following portion of the instruction: "If you are unable to reach a unanimous verdict as to the charge of first-degree murder, do not sign the first-degree murder verdict form and report your disagreement to the Court. The Court cannot accept a verdict of guilty of second-degree murder unless the jury also unanimously finds and returns a signed verdict form of not guilty as to murder of the first degree."

Defendant contends the instruction erroneously failed to inform the jury that it could deliberate on greater and lesser offenses in any order, and that as a result, it encouraged the jury to reach a guilty verdict as to first degree murder. He relies on the following statement from *People v. Kurtzman* (1988) 46 Cal.3d 322, 336 [250 Cal.Rptr. 244, 758 P.2d 572]: "Instructions should not suggest that a not guilty verdict must actually be returned before jurors can consider remaining offenses. . . ." (Fn. omitted.)

Defendant's argument is foreclosed by *People v. Nicolaus* (1991) 54 Cal.3d 551 [286 Cal.Rptr. 628, 817 P.2d 893] (*Nicolaus*). There, the defendant similarly argued that "CALJIC No. 8.75 impermissibly restricted the jury's ability to consider the full range of possible lesser offenses shown by the evidence." (*Id.* at p. 580.) The court explained that it had "repeatedly rejected the identical claim. (See, e.g., *People v. Hunter* (1989) 49 Cal.3d 957, 975-976 [264 Cal.Rptr. 367, 782 P.2d 608]; *People v. Adcox* (1988) 47 Cal.3d 207, 241-242 [253 Cal.Rptr. 55, 763 P.2d 906].)" (*Nicolaus, supra,* 54 Cal.3d at p. 580; see also *People v. Mickey* (1991) 54 Cal.3d 612, 672-673 [286 Cal.Rptr. 801, 818 P.2d 84].) The *Nicolaus* court further noted that CALJIC No. 8.75 was actually in conformity with the holding of *People v. Kurtzman, supra,* 46 Cal.3d 322: "In *People v. Kurtzman . . . ,* we construed our holding in *Stone v. Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809]'to authorize an instruction that the jury may not *return a verdict* on the lesser offense unless it has agreed . . . that defendant is not guilty of the greater crime charged, but it should not be interpreted to prohibit a jury from *considering* or *discussing* the lesser offenses before returning a verdict on the greater offense.' (46 Cal.3d at p. 329, original italics.) This is precisely what CALJIC No. 8.75 does." (*Nicolaus, supra,* 54 Cal.3d at p. 580.)

In addition, we note that defendant himself requested CALJIC No. 8.75. Therefore, he is precluded from complaining about that instruction on appeal. (*People v. Hernandez* (1988) 47 Cal.3d 315, 353 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1223, 1225 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

### *Admission of Prior Offense*

■ Defendant contends the trial court erred by permitting the prosecution to introduce evidence that he was involved in a prior gang-related shooting pursuant to Evidence Code section 1101, subdivision (b), to show his intent and motive.

Evidence Code section 1101, subdivision (b) permits "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

■ In *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*), the court explained that the admissibility of evidence pursuant to Evidence Code section 1101, subdivision (b) depends on the degree of similarity between the uncharged act and the charged offense. It explained the standards for admissibility of evidence to prove intent as follows: "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. . . . '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self- defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." . . .' " (7 Cal.4th at p. 402, citations omitted.)

■ Once a court determines that a prior bad act is admissible under Evidence Code section 1101, subdivision (b), it must conduct a further inquiry. "Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. . . .' . . . [¶] . . . [T]o be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. . . .' " (*Ewoldt, supra*, 7

Cal.4th at p. 404, citations omitted.) A court must therefore also examine whether the probative value of prior bad act evidence is substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.)

The factors affecting an analysis under Evidence Code section 352 were set forth in *Ewoldt, supra,* 7 Cal.4th 380, and *People v. Balcom* (1994) 7 Cal.4th 414 [27 Cal.Rptr.2d 666, 867 P.2d 777]. The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses. (*Ewoldt, supra,* 7 Cal.4th at pp. 404-405; *Balcom, supra,* 7 Cal.4th at p. 427; *People v. Falsetta* (1999) 21 Cal.4th 903, 917 [89 Cal.Rptr.2d 847, 986 P.2d 182].)

 In this case, the prior incident was described to the trial court during in limine motions as "one where the defendant instigated a gang confrontation by spraying mace from a car that he was in into another car of a member of the opposite gang who then armed themselves with baseball bats . . . and made a threatening move upon the car in which the defendant was residing . . . whereupon the defendant accessed a handgun that he had in his possession within the car that he was in and commanded fire, striking not just a member of the opposing gang but an innocent third party . . . ."

The trial court ruled that the incident was relevant to show defendant's motive and intent, because it would show "an intention upon the part of the defendant to engage in hostile action for no particular reason other than that the recipient of the hostile action is a member of an opposing gang. And it shows certainly more than an average degree of motivation to follow the dictates of the gang in this regard to pursue gang policy . . . ." The trial court also found that the prejudicial effect of showing defendant's involvement in a previous gang-related act of violence would be "minimized" by the fact that other evidence would show his association with gangs.

The trial court did place limitations on the admission of the evidence. It ruled that the jury would not be permitted to learn that defendant struck an innocent third party. It ruled that the prosecution could not present the testimony of the victim; rather, the incident could be introduced via "ancillary testimony on the part of the gang expert." Finally, it indicated it would provide a limiting instruction with regard to the evidence.

As ultimately introduced, the evidence did not establish that defendant actually committed a previous drive-by shooting. Rather, the jury learned that during a previous gang-related incident, defendant "maced one of the rival gang members who were in a passing vehicle or another vehicle at the time." The jury also learned that "a shooting resulted in which [defendant] admitted to being involved in." Before the evidence of the prior offense was introduced and at the end of trial, the trial court instructed the jury that the evidence could be used only for the limited purpose of determining defendant's intent and motive. (CALJIC No. 2.50 (1998 Rev.).)

The prior incident was relevant to prove defendant's intent and motive. The fact that defendant previously committed a drive-by shooting, under circumstances indicating that he did so for gang-related purposes, helped show that he likely committed the instant drive-by shooting for gang-related purposes.

The fact that the evidence of the prior incident had an independent source from the evidence of the charged offense increased its probative value. (See *Ewoldt, supra,* 7 Cal.4th at pp. 404-405.) By the time he faced the charges in this case, defendant had already admitted his involvement in the prior shooting. Thus, there was no risk that a witness's account of the prior incident would be influenced by knowledge of the current offense.

The prior incident occurred about five years before the current shooting. As "only a few years elapsed" between the two incidents, the probative value of the prior shooting was not affected. (See *Ewoldt, supra,* 7 Cal.4th at p. 405; cf. *People v. Harris* (1998) 60 Cal.App.4th 727, 739 [70 Cal.Rptr.2d 689] [remoteness of 23-year-old prior weighed "strongly in favor of exclusion"].)

The prejudicial effect of this evidence did not substantially outweigh its probative value. The jury had already learned of defendant's association with the Sureño gang and that he was on parole for a prior offense. As introduced, the evidence did not establish that defendant had committed a prior drive-by shooting, only that he was "involved in" a prior shooting and that he had "Maced" rival gang members. Thus, the evidence was neither stronger nor more inflammatory than the charged offense. We find no abuse of discretion here.

*Firearm Discharge Enhancement*

 Defendant contends imposition of the 25-year-to-life term for the firearm discharge enhancement (§ 12022.53, subd. (d)) constitutes cruel and

unusual punishment in violation of the state and federal Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) He contends that the imposition of the enhancement constitutes cruel or unusual punishment under *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], because it is grossly disproportionate to his culpability. Defendant also presents a facial challenge to section 12022.53, subdivision (d).

Section 12022.53 was added by the statutes of 1997, chapter 503, effective January 1, 1998. Section 1 of that chapter notes that "[t]he Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime." Section 12022.53, subdivision (d) provides: "Notwithstanding any other provision of law, any person who is convicted of [an enumerated felony, including murder], and who in the commission of that felony intentionally and personally discharged a firearm and proximately caused great bodily injury . . . or death, to any person other than an accomplice, shall be punished by a term of imprisonment of 25 years to life in the state prison, which shall be imposed in addition and consecutive to the punishment prescribed for that felony."

Section 12022.53, subdivision (h) explains that, "[n]otwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section." Furthermore, when an enhancement specified in section 12022.53 has been alleged in the information or indictment and either has been admitted or found to be true, subdivision (j) provides that "the court shall impose punishment pursuant to this section rather than imposing punishment authorized under any other provision of law, unless another provision of law provides for a greater penalty or a longer term of imprisonment."

 "[I]n our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments . . . ." (*In re Lynch* (1972) 8 Cal.3d 410, 414 [105 Cal.Rptr. 217, 503 P.2d 921].) "The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible." (*Id.* at p. 423.) "Reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." (*Solem v. Helm* (1983) 463 U.S. 277, 290 [103 S.Ct.

3001, 3009, 77 L.Ed.2d 637]; see also *In re Lynch, supra,* 8 Cal.3d at p. 414.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. [Citations]." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494 [90 Cal.Rptr.2d 517].)

 "The main technique of analysis under California law is to consider the nature both of the offense and of the offender. [Citation.] The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind. [Citations.]" (*People v. Martinez, supra,* 76 Cal.App.4th at p. 494.)

*In re Lynch, supra,* 8 Cal.3d 410 prescribed two other "techniques" for assessing whether a particular punishment is cruel or unusual: comparing the punishment to other punishments imposed by the same jurisdiction for more serious offenses and comparing the punishment to other punishments imposed by other jurisdictions for the same offense. (*Id.* at pp. 426-427). However, defendant does not claim that the punishment under section 12022.53, subdivision (d) is disproportionate to the punishment under similar California statutes, nor does he present any interjurisdictional claim.

 Defendant first contends that section 12022.53 is unconstitutional because it is mandatory in nature. However, the fact that the 25-to-life term is mandatory merely reflects the Legislature's zero-tolerance toward the use and discharge of firearms during the commission of a crime. It does not render the penalties excessive as a matter of law in every case. As the United States Supreme Court has stated, "There can be no serious contention . . . that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.' " (*Harmelin v. Michigan* (1991) 501 U.S. 957, 995 [111 S.Ct. 2680, 2701, 115 L.Ed.2d 836].)

Next, defendant contends that section 12022.53 is unconstitutional because it does not recognize gradations of culpability or take into account mitigating factors. In *People v. Martinez, supra,* 76 Cal.App.4th 489, the court rejected the same argument. We agree with that court's reasoning and therefore quote it here: "Section 12022.53 as a whole represents a careful gradation by the Legislature of the consequences of gun use in the commission of serious crimes. The section is limited, in the first place, to convictions of certain very serious felonies. . . . The statute then sets forth three

gradations of punishment based on increasingly serious types and consequences of firearm use in the commission of the designated felonies: 10 years if the defendant merely used a firearm, 20 years if the defendant personally and intentionally discharged it, and 25 years to life if the defendant's intentional discharge of the firearm proximately caused great bodily injury [or death]. . . . Thus, contrary to appellant's contention, the statute does recognize different gradations of culpability." (*Id.* at p. 495, fn. omitted.)

Finally, defendant argues that section 12022.53 is facially unconstitutional because it arbitrarily imposes severe punishment for use of a firearm but not other deadly weapons. A similar argument was presented in *People v. Martinez, supra,* 76 Cal.App.4th 489. The defendant in that case argued that the punishment for firearm use under section 12022.53 was disproportionate in comparison to the punishment for use of a knife under sections 12022, subdivision (b) and 12022.7, subdivision (a). The court explained that "the Legislature determined in enacting section 12022.53 that the use of firearms in commission of the designated felonies is such a danger that, 'substantially longer prison sentences must be imposed . . . in order to protect our citizens and to deter violent crime.' The ease with which a victim of one of the enumerated felonies could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives. [Citations.]" (*People v. Martinez, supra,* 76 Cal.App.4th at pp. 497-498.) We agree that the legislative determination regarding firearm use is reasonable. A firearm gives a perpetrator a strong advantage over the victim and effectively deters the victim's escape. A firearm is particularly lethal to the victim of the underlying crime as well as others in the vicinity; and a firearm allows the perpetrator to effortlessly and instantaneously execute an intent to kill once it is formed. (See *People v. Aguilar* (1973) 32 Cal.App.3d 478, 486 [108 Cal.Rptr. 179].) A criminal's decision to discharge a gun to kill another person is certainly an appropriate factor in determining the length of punishment.

We now turn to the question whether imposition of the section 12022.53 enhancement was cruel or unusual in the instant case. Here, defendant committed an unprovoked murder, for the apparent purpose of establishing himself within a street gang, and to establish the gang's strength in the community. The facts indicate that defendant planned the offense, by using a borrowed car and driving into rival gang territory. Defendant did not even know the victim; defendant selected Ortiz simply because Ortiz was associated with a rival gang. Defendant fired at least three shots from a semi-automatic firearm; one went through Ortiz's chest, killing him almost immediately. After he was arrested, defendant asked friends to hide evidence, and he denied guilt throughout trial and at sentencing.

Defendant's prior criminality includes a 1994 commitment to the California Youth Authority for committing an assault with a deadly weapon. During that incident, he sprayed Mace at rival gang members while they were driving. He also fired several shots from a gun, wounding not only one of the rival gang members, but also an innocent third party. Defendant had a previous arrest in 1993, when he brought a loaded firearm onto a high school campus. He later threatened to shoot the persons who turned him in for that offense.

At the time defendant committed the instant offense, he was on parole for his previous drive-by shooting. Clearly, "[h]e is a frequent repeat offender who seemingly has not learned from past incarceration." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510-1511 [84 Cal.Rptr.2d 638].) His recidivism and the violence of his past and current offenses warrant a lengthy sentence.

As noted above, defendant's argument focuses only on the nature of the offense and the offender; he does not compare the punishment imposed here to the punishment under other California statutes or under the laws of other states. After considering the nature of the offense and the offender, we conclude that to impose a prison term of 25 years to life for defendant's act of discharging a gun and thereby causing death, in addition to the 25-year-to-life term imposed for the murder count, does not " 'shock the conscience' " on this record. (*In re Lynch, supra,* 8 Cal.3d at p. 424.)

### DISPOSITION

The judgment is affirmed.

Cottle, P. J., and Wunderlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 11, 2001.