Filed 10/1/13  P. v. Sample CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H036207 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. Nos. CC788794, CC803714) |
| v. | |
| EDDIE JAMES SAMPLE et al., | |
| Defendants and Appellants. | |

A jury convicted defendants Eddie James Sample and Daniel Miller of first degree murder (Pen. Code, § 187),[1] and the trial court sentenced both to 25 years to life in prison.  On appeal, Sample claims the trial court (1) prejudicially abused its discretion in failing to suppress evidence obtained by unlawful and unconstitutional wiretaps and (2) prejudicially erred in failing to suppress pre-arrest statements obtained from him in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  He further contends that the cumulative effect of these errors denied him due process.

Miller adopts Sample's arguments to the extent they apply to him.  Miller further contends that (1) the trial court's refusal to admit the second part of his post-arrest interview violated Evidence Code section 356 and his right to present a complete defense; (2) the trial court's refusal to admit Sample's post-arrest statements exculpating

---

[1]     Further statutory references are to the Penal Code unless otherwise noted.

Miller and inculpating Sample and another person violated Miller's right to present a complete defense; and (3) the admission of cause-of-death testimony by a pathologist who did not attend the autopsy violated Miller's Sixth Amendment right to confront the coroner who performed the autopsy. Sample adopts Miller's third argument. We affirm the judgments.

## I. Background

In the early evening on January 25, 2006, Alfonso Neri walked from a friend's house in San Jose to a nearby market. On the way back, he noticed a man he had seen in the market walking ahead of him on South 22nd Street. Two other men, one on foot and one on a bicycle, seemed to be following the man. The followers stopped behind a trailer to talk, but Neri's limited English kept him from understanding what they said.

Neri saw the man on the bicycle ride in front of the man from the store, blocking his path. A few seconds later, the other man ran over and "beat [the victim] up with a bat." From his vantage point directly across the street, Neri saw the man with the bat hit the victim in the head "[a]bout seven times," and he heard "[a]bout five or six" additional blows. Neri saw the man on the bicycle strike and kick the victim. The attackers fled, and Neri saw the victim "try to get up and try to walk, but he couldn't."

Neri returned to his friend's house, and his friend called 911. Responding officers found a pool of blood and a few blood drops at the scene, but they were unable to locate a victim.

Later that night, different officers responded to a report of a man acting strangely in the driveway of a house three-quarters of a mile from where the attack occurred. They found Jorge Trujillo trying to break into a parked car with a garden rake. When he stared blankly at them and failed to respond to repeated commands, Trujillo was tased, wrestled to the ground, and taken into custody. "Once they had him in custody they made the

2

connection between the assault and the current case . . . and sent him to the hospital." Trujillo died the next day.

Police canvassed the area where the attack occurred. Gilbert Godinez reported hearing "like two sticks banging," and "all of a sudden . . . like three to four guys come running . . . from the scene . . . ." Godinez saw Trujillo struggle to get up, then limp away. Neri initially denied knowledge of the attack but eventually admitted having seen it. With Neri's assistance, a police artist made a sketch of the attacker on the bike.

Months later, the investigation had narrowed to focus on defendants, their friend Jason Garewal, and brothers Richard Torres and Emmanuel Flores. In October 2006, police obtained recent photos of Sample and Miller, and Neri positively identified both from photo lineups. "This looks like him, the kid on the bike," he said in selecting Miller's photo. "This is the one with the bat," Neri said in selecting Sample's photo. "He was holding the bat behind his back, and then he came up and hit the guy on the head."

In November 2006, police obtained an order approving wiretaps on defendants' phones. To stimulate conversation, they interviewed Torres's and Miller's girlfriends, Garewal, and later, Miller and Sample. In intercepted conversations, defendants placed themselves at the scene of the attack and spoke about sticking to the story they and their friends had agreed upon. In a December 11, 2006 conversation, Garewal informed Sample that police had told him not to worry because the investigation was focused more on his friends than on Garewal. Sample responded, "'I may have to run.'" Sample and Miller were arrested for the murder two days later.

Torres was arrested for the murder in April 2007. He initially denied knowledge of the attack. In November 2007, he agreed to plead guilty to an accessory-after-the-fact (§ 32) count in exchange for a prison sentence of no more than 36 months. The agreement was conditioned on his testifying fully and truthfully at trial.

3

Torres testified that on the day of the murder, he, defendants, Garewal, and Flores smoked marijuana at a school and decided to pawn Flores's Xbox for more marijuana. The group walked to the brothers' house, and defendants and Garewal waited in a shed and then by the front gate while Torres and Flores went into the house. When Torres and Flores came out with the Xbox, Torres saw Miller block Trujillo's path with his bike as Sample ran up and hit Trujillo in the head with a bat. When Trujillo "dropped," Sample bent down and hit him four or five more times with his fists, and Miller kicked and punched Trujillo. Torres ran toward them, shouting, "What the fuck?" The attack stopped, Sample picked up the bat, and all five "took off" running toward a nearby Wienerschnitzel. Defendants and Garewal got into a car driven by Miller's brother, and Torres and Flores "did the [Xbox] transaction."

When the five met the next day, Torres asked "what it was about," and Sample said, "[t]he guy was a scrap [a derogatory Norteño word for Sureños] so we beat him up." A week later, Sample told Torres he had gotten rid of the bat, and all agreed "[n]ot to say nothing" about the attack. After that, Torres "disappeared."

Godinez and Neri also testified for the prosecution. Neri told the jury the attack was something he would "[n]ever" forget. He was "scared," but he had been truthful and as accurate as possible in all of his interactions with police.

Homicide detective Brian Ferrante and other officers described the investigation. Police captain Meynard Gamez described Neri's positive identifications of defendants from the October 2006 photo lineups.

Dr. Victor Tse, a board-certified neurosurgeon at Valley Medical Center in San Jose, testified as an expert in head trauma. Trujillo arrived in the emergency room around 9:56 p.m. on January 25, 2006, and CT scans revealed multiple skull fractures. Dr. Tse diagnosed severe head trauma with no blood flow to the brain, and he pronounced Trujillo brain dead the next day. Trujillo's injuries were consistent with blunt force trauma.

4

Dr. Michelle Jordan, a board-certified pathologist employed as an assistant medical examiner for Santa Clara County, testified as an expert in pathology, neuropathology, forensic pathology, and taser-related deaths. Since she had not attended the autopsy, Dr. Jordan based her testimony on autopsy photographs taken by crime scene investigator Tom Schnutenhaus and on her review of Trujillo's medical records. The photos revealed three separate skull fractures as well as comminuted skull fractures—"essentially, that the skull is just like a broken eggshell." Dr. Jordan also pointed out "very large, jagged lacerations," one of which "approach[ed] 1.5 inches in depth." Other photos showed subgaleal hemorrhage indicative of "massive head trauma" and "significant subarachnoid hemorrhage" indicative of severe blunt force trauma. These were "significant" injuries, and any one was sufficient to cause Trujillo's death. Trujillo's head injuries were consistent with someone being hit with a bat. Dr. Jordan opined that Trujillo died from blunt force trauma to the head caused by an assault, that he could not have survived his injuries, and that tasing had "nothing to do with" his death.

The defense theory was that Neri's identifications were "questionable" and that Torres was a "gangster" who was "lying" to avoid a life sentence. Recalled to the stand, Torres confirmed that he had been released shortly after he testified and was awaiting sentencing pursuant to his plea agreement. Nelia Matos, who lived "right across the street" from Torres's former residence on South 22nd Street and had dated him "for a bit," testified that she had seen Torres outside, wearing baggy black and red clothing, on the evening of the attack. Ferrante was recalled for questioning about the extent of his investigation into Torres's "gang connections," and he and officer Daniel Ichige were questioned about the photo lineups shown to Neri.

The jury found defendants guilty of first degree murder. The trial court sentenced both to 25 years to life in prison. Defendants filed timely notices of appeal.

5

## II.  Discussion

### A.  Motion to Suppress Wiretap Evidence

Defendants challenge the trial court's denial of Sample's motion to suppress evidence obtained in alleged violation of state and federal wiretapping statutes and the Fourth Amendment.  Suppression was required, they argue, because the issuing judge authorized the wiretaps on an inadequate showing of necessity.  We disagree.

"In general, California law prohibits wiretapping."  (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1195 (*Zepeda*); § 631.)  A court may authorize a wiretap, however, if the application contains facts showing that "there is probable cause to believe that an individual has committed, is committing, or is about to commit one or more of the listed crimes (§ 629.52, subd. (a)); there is probable cause to believe that communications concerning the illegal activities will be obtained through that interception (§ 629.52, subd. (b)); there is probable cause to believe that the communications device will be used by the person whose communications are to be intercepted (§ 629.52, subd. (c)); and '[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous' (§ 629.52, subd. (d) . . . .)" (*People v. Leon* (2007) 40 Cal.4th 376, 384 (*Leon*).)  The fourth requirement is commonly referred to as the necessity requirement.  (*People v. Roberts* (2010) 184 Cal.App.4th 1149, 1172 (*Roberts*).)  The federal wiretapping statute employs virtually identical necessity language.  (18 U.S.C. § 2518(3)(c); *Leon*, at pp. 384-385.)

"The requirement of necessity is designed to ensure that wiretapping is neither 'routinely employed as the initial step in criminal investigation' [citation] nor 'resorted to in situations where traditional investigative techniques would suffice to expose the crime.' [Citation.] [It] can be satisfied 'by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case.' [Citation.]" (*Leon*, *supra*, 40 Cal.4th at p. 385.)  "The burden of establishing necessity is 'not great.'" (*United States v. Gray* (7th Cir. 2005) 410 F.3d

338, 343.) "As numerous courts have explained . . . , it is not necessary that law enforcement officials exhaust every conceivable alternative before seeking a wiretap. [Citations.] Instead, the adequacy of the showing of necessity ' "is 'to be tested in a practical and commonsense fashion,'. . . that does not 'hamper unduly the investigative powers of law enforcement agents.' " ' [Citation.] A determination of necessity involves ' "a consideration of all the facts and circumstances." ' [Citation.]" (*Leon*, at p. 385.) "The finding of necessity by the judge approving the wiretap is entitled to substantial deference." (*Leon*, at p. 385, citing *Zepeda*, *supra*, 87 Cal.App.4th at p. 1204 ["The trial court's determination that the 'necessity' requirement was met is reviewed for abuse of discretion."].)

A defendant who believes that evidence was "obtained in violation of the Fourth Amendment of the United States Constitution or of [California's wiretapping statute]" may move to suppress its use at trial. (§ 629.72.) Such a motion is "subject to review in accordance with the procedures set forth in Section 1538.5." (§ 629.72; *People v. Jackson* (2005) 129 Cal.App.4th 129, 146 (*Jackson*).) "Generally, when reviewing a motion to suppress evidence, 'we must accept the trial court's resolution of disputed facts and its assessment of credibility [citation], but, the issue whether, under the facts found, a seizure or search was unreasonable is a question of law, as to which the appellate court is bound to exercise its independent judgment.[2] [Citations.]' [Citation.]" (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1192.)

---

   [2]   *Jackson* states that "In reviewing a trial court's ruling on a motion to suppress evidence we defer to the court's express or implied factual findings if they are supported by substantial evidence. [Citation.] We exercise our independent judgment to determine whether, on the facts found, a search conducted by wiretap was 'reasonable' under the Fourth Amendment *and whether the wiretap was authorized and conducted in conformity with the federal and state statutes regulating such a search.*" (*Jackson*, *supra*, 129 Cal.App.4th at p. 146, fns. omitted, italics added.) The court cited *Zepeda* to support the latter proposition, but *Zepeda* nowhere states that whether a wiretap was authorized and conducted in compliance with the relevant statutes is reviewed independently. Quite the contrary: *Zepeda* states that "[t]he trial court's determination that the 'necessity'

It is apparent to us that a search conducted by wiretap is reasonable under the Fourth Amendment as a matter of law if the wiretap was authorized and conducted in full conformity with the federal and state wiretap statutes. (See *Jackson*, *supra*, 129 Cal.App.4th at p. 146 [stating that in the context of motions to suppress wiretap evidence, "[t]he analysis . . . focuses on violations of the statutory procedures and not on constitutional violations, because while it is possible to violate a core principle of the [wiretap] statute without violating the Fourth Amendment it would not seem possible to violate the Fourth Amendment without also violating a core statutory principle.]".) The dispositive issue here, then, is whether there was an adequate showing of necessity. The record establishes that there was.

We reject defendants' assertion that "Ferrante's declaration failed to show that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." In his 49-page declaration, Ferrante described conventional investigative techniques that had been used with only limited success in the 10-month investigation. During a canvass of the area on the day after the attack, he learned that Godinez had heard what sounded like a beating with bats and had "observed from a distance the individual . . . being beaten with a bat." Godinez had "observed a subject run to the point of attack . . . and exclaim, 'What the fuck?'" Godinez saw "three to four attackers in all." He "did not get a good look at [them]" because it was dark, but he recalled that one of the fleeing attackers was riding a black BMX bicycle. In a subsequent canvass, another neighbor told Ferrante that "[Torres] and [Flores]," two "totally unsupervised" brothers who "acted like gang members," lived in the "back house" across the street from the scene. The house's owner said it had been vacant since

requirement was met is reviewed for abuse of discretion. [Citations.]" (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1204.) "[T]he trial court did not abuse its discretion by finding that the necessity requirement of section 629.52 had been met," the *Zepeda* court held, concluding "that the trial court properly denied defendant's motion to suppress the evidence obtained from the wiretap in defendant's jail cell." (*Zepeda*, at p. 1207.)

8

the attack. Ferrante learned that Torres was on probation with search and gang conditions.

In February 2006, Matos admitted having seen Torres and Flores across the street from her house around 6:00 p.m. on the night of the attack. She admitted "continuous contact" with Torres after the attack and gave Ferrante his phone number. John Kerestesy, who lived next door to Matos, said Flores told him two days after the attack that Torres and a friend had " 'beaten up' a guy" in front of their house and that Flores had "joined" the attack. Kerestesy provided Flores's phone number.

Torres refused to be interviewed, and his whereabouts were unknown. Flores was interviewed three times. He denied involvement. His mother ended his second interview when Ferrante began questioning him about inconsistencies in his statements. A search of Flores's residence uncovered "no evidence pertinent to this investigation." When Flores was questioned a third time, he told police that Kerestesy had told him on the Friday after the attack "that Kerestesy had beaten [Trujillo] because Kerestesy believed that [Trujillo] was responsible for stealing his . . . car on New Year's Day."

Police met with Neri numerous times and with his assistance prepared a sketch of the man on the bicycle. In February 2006, Neri tentatively identified Cesar Galeana from a photo lineup as the man on the bicycle. After several searches, police eliminated Galeana as a suspect. In March 2006, Neri tentatively identified Kerestesy from a different photo lineup as the attacker with the bat. After a search of Kerestesy's residence and a "lengthy" interview, police eliminated him as a suspect.

In April 2006, police seized Torres's cell phone and found a digital photo that matched Neri's description of the bat-wielding attacker. The photo was associated with a phone number for "Eddy." A search warrant for phone records identified "Eddy's" phone number as Sample's. A police records check turned up a description but no photograph.

Re-interviewed in October 2006, Matos admitted calling Torres after each of her interviews but said she had lost contact with him. She showed police the brothers' MySpace pages, from which police obtained a link to Sample's MySpace page. All three MySpace pages referenced Norteño gangs.

Seeking a current photo of Sample, police conducted surveillance, and school officials identified him and Miller from the surveillance photos. A police records check revealed that Miller had been stopped by police in December 2005 and that he had been riding a black BMX bicycle. Torres's cell phone contained a phone number for a "D_Miller," and re-examination of phone records obtained by search warrant revealed many calls between Torres, Sample, and Miller on the day after the attack and after each of Matos's interviews. There was only "limited" telephone contact between Torres and Sample before the attack, "but contact . . . occurred daily" from the day after the attack until February 3, 2006, when Torres's cell phone number was deactivated.

On October 17, 2006, school officials gave Ferrante "current school-generated photograph[s]" of Sample and Miller. Two days later, police showed Neri new photo lineups, and he "immediately" identified Sample as "the one with the bat" and Miller as "the kid on the bike." During the drive to the police station to memorialize his identifications, however, Neri "appeared nervous and emotional." "He asked if the subjects in the photographs . . . were members of gangs. [He] then slumped down in his seat in the vehicle . . . ." At the station, Neri "appeared even more nervous than before. . . . [He] stated that he was not sure [of the identification], as it was in the afternoon . . . and he could not see that well." Although Neri ultimately selected Miller's and Sample's photos, he equivocated about both, stating with respect to Miller's, "I believe that is him, but like I just said, I'm not sure," and noting with respect to Sample's that the attacker with the bat "was wearing a hat. He looks a little like this guy."

"I believe the attack . . . to be gang-related," Ferrante declared. "Jorge Trujillo was a victim of circumstances: Wrong place; wrong color . . . [Trujillo] looked the part

10

of a *Sureno* gang member—a dress and look not conducive to the *Norteno* climate that existed in that neighborhood." There was probable cause to believe Torres, Flores, Sample, and Miller murdered Trujillo, Ferrante declared, but "the evidence, as presently known, is insufficient to convict any of [them] of murder beyond a reasonable doubt . . . ." "[T]he communications sought to be intercepted will provide the additional evidence necessary to charge [Torres], [Flores], [Sample], and/or [Miller] with the murder of [Trujillo]."

We conclude that Ferrante's declaration established the requisite necessity. His detailed recitation of the 10-month investigation was more than sufficient, in our view, to show that "normal investigative procedures ha[d] been tried and . . . failed. . . ." (§ 629.52, subd. (d).) The declaration explained that the crime scene had "yielded no evidence of forensic analytical value." The neighborhood had been canvassed "numerous" times, and "exhaustive" interviews had been conducted. "Numerous" search warrants had been executed and "as many as six physical locations" searched, "including the residences of [Torres] and [Flores]." Phone and other records had been obtained by search warrant. Surveillance had been conducted "on more than ten occasions," and while it had established the identity of one suspect and the current residences of two, it had produced "no real evidence [of] the crime itself." Rewards for information, publicized in the media and by flyers distributed door-to-door in the neighborhood where the attack occurred had produced "no additional witnesses or new information." After 10 months, there were no further "worthy investigative leads to explore."

This showing alone was sufficient to establish the requisite necessity. (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1204.) As this court has explained, "[b]ecause section 629.52, subdivision (d), like [the analogous federal provision], is 'worded in the disjunctive, the government may establish the need for a wiretap by showing *either* (i) that normal investigative procedures have been tried and failed, *or* (ii) that normal investigative procedures, though not yet tried, "reasonably appear" to be either "unlikely

11

to succeed if tried" or "too dangerous." [Citation.] In reality, this gives the government three alternative ways to establish the need for a wiretap.'" (*Zepeda*, at p. 1204, quoting *U.S. v. Smith* (4th Cir. 1994) 31 F.3d 1294, 1298, fn. 2.)

Here, in addition to describing conventional methods that had been tried with little success, Ferrante also described procedures that had not been utilized because they reasonably appeared to be "unlikely to succeed if tried" or "too dangerous." (§ 629.52, subd. (d).) He explained that pen registers and trap and trace devices[3] do not identify the callers or provide the contents of the traced communications. "For that reason, this investigation would be better served if pen registers and trap and trace devices are installed and used in conjunction with, rather than in lieu of, [wiretaps] . . . [and] I make separate application for an order authorizing [pen registers and trap and trace devices]." Ferrante also declared that he did not know of any confidential informants who could furnish additional information, and attempts to develop informants would not be safe, given gang members' "common practice" of using violence to intimidate and silence those able to testify against them. Gang members' mistrust of "'outsiders'" (particularly when the gang is involved in ongoing or recent criminal activity) made the use of undercover agents both impractical and unsafe, since the agents would be subjected "to the same acts of violence" that gangs perpetrate on other potential witnesses. Initiation of grand jury proceedings might jeopardize the investigation, "as there is always the potential that information disclosed to testifying witnesses . . . may be leaked," and it was also "likely" that the targets of the investigation, if called before a grand jury, would exercise their Fifth Amendment rights or testify untruthfully. Police had not interviewed

---

[3]     "A pen register is a mechanical device which records the numbers dialed from a telephone, but it does not overhear oral communications or indicate whether the call was completed." (*People v. Blair* (1979) 25 Cal.3d 640, 654, fn. 11; see 18 U.S.C. § 3127(3) [defining "'pen register'"].) A trap and trace device records the number of the telephone that dialed the target phone. (*United States v. Gonzalez, Inc.* (9th Cir. 2005) 412 F.3d 1102, 1112; see 18 U.S.C. § 3127(4).)

Sample and Miller or searched their residences because contact with them "at this point would only serve to alert them that they are targeted suspects . . . , likely causing them to flee their residences if not the area . . . ." In sum, Ferrante's declaration was more than sufficient to establish necessity. (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1204.)

Defendants argue, however, that Ferrante's statement that conventional investigative techniques had failed to produce sufficient evidence to *charge* defendants was "untrue." They claim Neri's positive identifications were "more than enough evidence" to *charge* defendants, "particularly when combined with the other evidence Ferrante had gathered . . . ." The argument lacks merit.

As an initial matter, the standard is not whether the investigation has produced sufficient evidence to *charge* a defendant. "[A] wiretap can be necessary if it gives the government the ability to 'develop an effective case.'" (*United States v. McGuire* (9th Cir. 2002) 307 F.3d 1192, 1198 (*McGuire*).) An effective case, the *McGuire* court explained, means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." (*Ibid.* [rejecting argument similar to defendants' as "weak"].) Moreover, defendants' focus on Ferrante's statement about *charging* defendants ignores statements elsewhere in Ferrante's declaration that he believed "the evidence, as presently known, [was] insufficient to *convict* any of the Target Subjects of murder beyond a reasonable doubt . . . ." (Italics added.)

We disagree with defendants' assertion that conventional investigative techniques had produced "more than enough" evidence. In our view, Ferrante's declaration, taken in its entirety and interpreted "in a practical and commonsense fashion," established that conventional methods had yielded insufficient evidence to develop an effective case. (*Leon*, *supra*, 40 Cal.4th at p. 385; *McGuire*, *supra*, 307 F.3d at pp. 1197-1198.) As Ferrante explained, Neri's identification of defendants as the two attackers was, after multiple interviews, "tentative at best." Neri had been "hesitant" from the beginning to provide information, and it was "obvious" that he was "frightened." "In fact," Ferrante

13

declared, Neri "stated that he was afraid of retaliation from the attackers and/or their friends should he share his knowledge . . . ." Neri did not recognize anyone in the first photo lineup. Shown the same lineup a second time, he tentatively identified Galeana as the attacker on the bicycle. Shown a different photo lineup several weeks later, he tentatively identified Kerestesy as the attacker with the bat. Police eliminated both as suspects.

Shown another photo lineup six months later (the day after police obtained recent photos of defendants), Neri "immediately" identified Sample as the attacker with the bat and Miller as the attacker on the bicycle. But he started equivocating at the police station, claiming that he was "not sure" and that he had not been able to "see that well." "The positive identifications," Ferrante declared, "had now been reduced to tentative at best, reasonably likely due to [Neri's] fear of retaliation . . . ." Neri remained nervous even after he made the identifications. Refusing to make eye contact, he informed the officers that his mother was ill and that his father had asked him to return to Mexico to help with her care. His father was also in poor health, Neri added. Thus, it was by no means certain that Neri would be available to testify at trial, and even if he was, it was not certain he would positively identify defendants in open court. Under these circumstances, we cannot agree that Neri's positive identifications provided "more than enough evidence to charge" *and convict* defendants. (*McGuire*, *supra*, 307 F.3d at p. 1198; *United States v. Brone* (9th Cir. 1986) 792 F.2d 1504, 1506.) There was no useful physical or forensics evidence linking them to the crime, and Godinez, the only other eyewitness, had been farther away than Neri and had not gotten a good look at the attackers.

Defendants also fault Ferrante for not interviewing Sample or Miller. As Ferrante explained in his declaration, however, such interviews were unlikely to prove useful given the "communication pattern" that Torres and defendants had developed since the murder, which strongly suggested "a coordinated effort to maintain a consistent version

14

of events." Defendants dismiss this statement as "nothing but speculation," but Matos admitted calling Torres after each of her police interviews, and telephone records obtained by search warrants showed that each police contact with Matos "resulted . . . in an ensuing phone call from [Matos] to [Torres], who, in turn, calls [Sample], who, in turn, calls [Miller], triggering a series of phone conversations amongst Torres, Sample, and Miller." Ferrante's declaration also established a foundation for his "coordinated effort" conclusion. He explained, based on his training and experience, his interactions with fellow officers and detectives working gang-related cases, and his discussions with gang members, "that perpetrators of homicide and other violent crimes, gang-related or otherwise, frequently freely discuss their criminal deeds with co-participants . . . . Some do so seeking help from detection or apprehension by the authorities . . . . Topics discussed . . . include the current state of the criminal investigation, 'tracks' that need to be 'covered,' and coordination of stories to be told to the authorities if contacted and/or arrested." Ferrante's explanation adequately explained why interviewing defendants "reasonably appear[ed] . . . to be unlikely to succeed if tried . . . ." (§ 629.52, subd. (d); see *McGuire*, *supra*, 307 F.3d at pp. 1197, 1199 [necessity shown notwithstanding limited interviews of witnesses where "the only persons knowledgeable about the content of the defendants' transactions were the defendants themselves, *and the defendants had limited incentive to cooperate*"], italics added.)

Defendants also challenge Ferrante's statement that efforts to interview them would "likely" have caused them to flee. We are not persuaded by their argument that "youthfulness" and "family ties to San Jose" made flight unlikely. Ferrante's declaration noted Torres's "sudden move" from his former residence across the street from the scene of the attack. It was not inconceivable that defendants, who remained in telephone contact with Torres, might also flee. At 15 and 16, they were not too young to take care of themselves.

15

Defendants argue that Ferrante should have interviewed Flores a fourth time, using the police artist's sketch to "pressure" him. Ferrante explained, however, that Flores's previous lies and generally unreliable and internally inconsistent statements made it unlikely that a fourth interview would uncover useful information. This was a sufficient explanation. The wiretap statutes "[do] not mandate the 'indiscriminate pursuit to the bitter end of every nonelectronic device . . . to a point where the investigation becomes redundant or impractical . . . .'" (*United States v. Bailey* (9th Cir. 1979) 607 F.2d 237, 242.)

We conclude that Ferrante's declaration more than satisfied the "necessity" requirement of the wiretap statutes. On the facts presented, the issuing judge could reasonably have concluded that "[n]ormal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] either to be unlikely to succeed if tried or to be too dangerous." (§ 629.52, subd. (d); 18 U.S.C. § 2518(3)(c).) Where, as here, defendants do not challenge the issuance of the wiretap order on any other ground, it follows that the wiretaps were authorized in compliance with the governing statutes.

Defendants' claims of Fourth Amendment error parallel their claims of statutory error, as both are entirely founded on the alleged inadequate showing of necessity. Defendants do not claim that the wiretap searches were unreasonably conducted. Because the issuance of the wiretap order and the execution of the wiretap searches complied with the governing statutes, defendants' Fourth Amendment rights were not violated. (See *Jackson*, *supra*, 129 Cal.App.4th at p. 146.)

**B. Motion to Suppress Statements Obtained in Alleged Violation of *Miranda***

Sample challenges the denial of his motion to suppress statements from his December 6, 2006 police interview as "the unconstitutional product of a custodial interrogation without *Miranda* warnings." (Boldface & capitalization omitted.)

16

## 1. Background

Ferrante, detective Sean Pritchard, and Sample testified at the suppression hearing, and an audio recording of their December 6, 2006 interactions at Sample's high school, during the ride to the police station, and in the interview was marked as an exhibit. Viewed in the light most favorable to the judgment, that evidence and the officers' and Sample's testimony at the hearing on the motion established that the officers went to Sample's school and asked that he be called to the office. They introduced themselves as homicide detectives, remarked that he probably knew they had been talking to his friends about Torres and Flores, and said it was not surprising they wanted to talk to him. They asked him to accompany them to the police station for half an hour or so, after which they would drive him home. Ferrante assured Sample that he was not under arrest and that they did not intend to arrest him that day but just wanted to talk to him.

Sample said he had to call his mother first. "Sure. Give her a ring," Ferrante replied. After Sample tried without success, Pritchard said, "Why don't we go down, and maybe we can call her in a little bit. All right?"

Sample rode in the front passenger seat of the detectives' unmarked vehicle. He was not handcuffed, and the car doors were not locked. Conversation during the 15-minute ride consisted largely of small talk about Sample's family, girlfriend, and school activities.

At the station, Sample was offered water or a soda and shown to an interview room. The door to the room was closed but not locked during the interview. Pritchard began by snapping Sample's photo, explaining that they always took people's pictures "just to remind ourselves who they are." He then repeated what Ferrante had said at the high school—that Sample was not under arrest. Sample responded affirmatively when asked if he understood. Pritchard obtained some personal information and when he learned that Sample had his cell phone with him, asked, "Could you do me a favor and turn it off?"

Commenting that he would expect Sample to have talked to his friends about their police interviews, Ferrante asked Sample to relate what he had heard. Sample said he knew there had been a murder, supposedly committed by Torres. He knew that his own and Miller's names had come up, and that police had pictures that looked like both of them. He also knew that his friends had provided DNA samples.

Sample said he had met Torres "one random day" two years earlier but had stopped hanging out with him after Torres started stealing. Torres had shown up two days after his release from jail, and Sample's mother had told him not to come around anymore. That had been at the beginning of the year, and Sample had not seen Torres since then. He had encountered Flores on only three or four occasions and had not spoken to him in a long time. Sample had never been to Torres's house, and except for one trip to the movies on Second Street, had never gone downtown or out toward Santa Clara Street or Highway 101 with Torres.

Sample said he never went beyond 4th Street on foot, as that was gang territory. He knew gang members in his neighborhood but did not hang out with them, preferring to skateboard and ride dirt bikes with Garewal. Most gang members in his neighborhood claimed Norteño. Sample had seen some gang graffiti but did not know what it meant. Although Torres and Flores never wore gang clothing around him, Sample guessed that they were gang members. He had noticed four dots tattooed on Torres's hand after Torres's release from jail. Asked about being "the only white guy" in the group, Sample said he fit in with everyone.

Sample said Miller had called him after Miller's interview and told him police would probably interview Sample soon. Sample knew police had interviewed Miller's girlfriend Samantha Mendez first, then Garewal, and then Miller. He learned about the investigation from Mendez after her interview, but claimed not to know where the attack occurred. Mendez had told him about the sketches, and Miller had told him they looked *exactly* like Sample and Miller. When Ferrante said it was a weird coincidence that

18

Sample had been hanging out with Torres and police had sketches that looked like Sample and Miller, Sample replied that he was freaked out by that, but he knew for a fact that he had not been with Torres. Ferrante asked Sample to think "really hard" whether there was any reason for him to have been "on, say, 22nd Street" with Torres "[b]ack in like, that January [of 2006]."

"Actually, yeah, I completely forgot about that," Sample replied, "but there was one time I went down there with him. I completely, one night he, yeah, it was me and [Miller] and [Torres] and I'm not sure if [Garewal] was with us or not." "[Torres] was like, 'You wanna walk with me to my house, or whatever over on,' you know, yeah, I don't know if it's 19th or 22nd. Where's the Wienerschnitzel at right there?" Sample said Torres had an Xbox, "and he was gonna bring it to our house or whatever." Sample, Miller, and Garewal waited outside the house while Torres went inside, and when Torres came outside, Flores was with him, and they all started walking to the Wienerschnitzel. "[A]nd then we were gonna supposedly walk back . . . ," but Torres and Flores changed their minds, so Miller called his brother Arthur, who picked up Miller, Garewal, and Sample at the Wienerschnitzel and drove them home. This was "like, in the beginning of the year." It was "late at night." That was "[t]he only time" Sample had ever been to Torres's house. It was "the only time" he had "ever been in that neighborhood, ever."

Sample insisted that nothing happened while he, Miller, and Garewal waited outside Torres's house. Although they all had BMX bicycles, they were on foot that night. After walking all the way from Luther Burbank School to Torres's house, they did not want to walk home, so they called Miller's brother, and he drove them home.

About 48 minutes into the interview, the detectives showed Sample two sketches, the first prepared from Neri's description of the attacker on the bicycle, and the second drawn from a photograph of Sample. Sample opined that the first sketch did not look all that much like Miller, except for the long curly hair. He was "shocked" by his own sketch. But he insisted that he had nothing to do with the attack, suggesting that there

19

had to be someone else out there who looked like him. He had never once been in a fistfight. He was not a violent person. Asked if he had ever "hit anyone with anything," he responded, "Nothing at all, with a bat, nothing."

Sample agreed to provide a DNA sample and did so after a break lasting about 10 minutes. Pritchard then asked him to describe again what had occurred at Torres's house. At the detectives' request, Sample drew a diagram as he repeated that he and his friends had walked to Torres's house and waited just a minute. When Torres and Flores decided not to go with them, Sample, Miller, and Garewal walked to the Wienerschnitzel and called Miller's brother for a ride. Sample was completely sober that night. He insisted he had told the detectives everything he knew. The two-hour interview ended with them telling him, "We're ready to go."

The trial court denied the suppression motion, finding that the December 6, 2006 interview was a noncustodial encounter that did not require *Miranda* warnings. "The court has taken into account the totality of the circumstances surrounding the questioning with the ultimate inquiry being whether there was a formal arrest or restrain[t] of freedom of movement of the degree associated with [a] formal arrest. [¶] Without citing all the specific circumstances, the court concurs with the [statement of facts] cited by [the district attorney] on pages four, five and six of his brief, and also relies heavily on the contents of the C.D. of the [December 6, 2006] contact between the defendant and the officers. The defendant was advised on more than one occasion that he was not under arrest. That they had no plans to arrest him. And all they wanted to do was to talk to him. After which he would be taken home which was what occurred. [¶] And this was also consistent with what the defendant acknowledged had occurred with other friends. [¶] So the December 6th, the court will deny that motion based on the *Miranda* argument that was made."

20

## 2. Analysis

Sample argues that "[b]y the time the detectives questioned [him] about the fake sketch," he was in custody for purposes of *Miranda*. We disagree.

"An interrogation is custodial, for purposes of requiring advisements under *Miranda,* when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.]. Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present. [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).) "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances . . . ." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)

"'When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave" [citation].' [Citation.]." (*Moore*, *supra*, 51 Cal.4th at p. 395.)

Here, substantial evidence supports the facts found by the trial court. Sample's own statements during the interview established that he knew before his December 6, 2006 interview that detectives had interviewed his friends without arresting them, that there was a police artist's sketch that looked *exactly* like him, and that he would probably be interviewed soon. The detectives' testimony and the audio recordings

21

of their December 6, 2006 exchange with Sample at his high school established (1) that school administrators were present when the detectives spoke to Sample, (2) that Ferrante assured him he was not under arrest, that they did not intend to arrest him that day but just wanted to talk to him for half an hour or so and that they would drive him home afterwards, (3) that the detectives *asked* rather than told Sample to accompany them to the police station, (4) that when he said he needed to call his mother first, he was permitted to do so, and (5) that he chose not to leave a message when his calls went unanswered.

The detectives' testimony and the audio recording of the ride to the police station established (1) that Sample was driven there in an unmarked vehicle, (2) that he rode in the front passenger seat, (3) that he was not handcuffed, (4) that the car doors were unlocked, and (5) that upon arrival at the station he was offered water or a soda.

The detectives' testimony and the audio recording of the interview establish (1) that Sample was shown to an interview room in the homicide unit, (2) that the door was closed but not locked during the interview, (3) that Sample was again assured that he was not under arrest, (4) that he had his cell phone with him and that there were two breaks during which he was left alone and could have called whomever he chose, (5) that the interview was conducted in a respectful, nonaggressive, and nonthreatening manner, (6) that the detectives reiterated several times that they would drive Sample home afterwards, (7) that Sample agreed to provide a DNA sample, (8) that the detectives thanked him for talking to them, and (9) that at the end of the two-hour interview, they drove him home.

We think a reasonable person in Sample's position would have felt free, under these circumstances, to end the questioning and leave. (*Moore*, *supra*, 51 Cal.4th at p. 395.) Sample was told twice that he was not under arrest, and he was also assured that police did not intend to arrest him that day. The door to the interview room was not locked. Although Sample was asked at the start of the interview to "do [Pritchard] a

22

favor" and turn off his cell phone, it was not taken from him, and there were at least two breaks when Sample was left alone and could have called anyone he wanted to call.

Sample testified at the hearing, however, that he felt he had no choice but to go to the police station and that once he got there, "I sure didn't think I could just get up and leave." "I mean, . . . I [didn't] know what could happen, you know, like, they can shoot me, or I don't know what." But his subjective understanding is irrelevant. (*Stansbury v. California* (1994) 511 U.S. 318, 323 (*Stansbury*); *In re Kenneth S.* (2005) 133 Cal.App.4th 54, 64 (*Kenneth S.*).) "The objective circumstances of the interrogation, not the subjective intention of the interrogating officer or the subjective understanding of the person being questioned, is evaluated in determining whether the person was in custody . . . ." (*Kenneth S.*, at p. 64.)

Acknowledging the existence of circumstances that could tip the balance *against* a finding that he was in custody, Sample characterizes "Ferrante's pointed use of the fake witness sketch" as the factor that "must tip the court's independent review in [Sample's] favor . . . ." Being confronted with evidence that he had participated in the assault, Sample argues, would have "wipe[d] out" the officers' previous assurances and rendered it "decidedly *unreasonable*" for him to believe he was free to terminate the questioning and leave.

The United States Supreme Court rejected a similar argument in *Oregon v. Mathiason* (1977) 429 U.S. 492 (*Mathiason*). Mathiason went to the police station for an interview. He was told he was not under arrest, taken into an office, and questioned about a burglary. (*Id.* at 493.) The door was closed during the interview. (*Ibid.*) Police told Mathiason they believed he was involved in the burglary, and they also told him, falsely, that his fingerprints had been found at the scene. (*Ibid.*) He confessed and was convicted of burglary. (*Id.* at pp. 492-493.) The Oregon Supreme Court reversed the conviction, holding that *Miranda* warnings should have been given. (*Id.* at p. 492.)

23

The United States Supreme Court reversed, holding that a noncustodial situation "is not converted to one in which *Miranda* applies simply because . . . the questioning took place in a 'coercive environment'" or "because the questioning takes place at the station house, or because the questioned person is one whom the police suspect." (*Mathiason*, *supra*, 429 U.S. at p. 495.) The officer's false statement about discovering Mathiason's fingerprints at the scene, moreover, had "nothing to do with whether [Mathiason] was in custody for purposes of the *Miranda rule*." (*Id*. at p. 496; see *Kenneth S.*, *supra*, 133 Cal.App.4th at p. 65 ["that Detective Carranza told respondent that he had information that respondent was involved in the robbery was insufficient by itself to constitute custody and to countervail these other factors."].)

We cannot agree with Sample's assertion that the fake sketch tips the balance here. Sample knew before the interview that police had sketches of him and Miller, and Miller had told him that the sketches looked "exactly" like the two of them. Yet Miller had been allowed to go on his way after his interview. A reasonable person in Sample's position would have no reason to believe that his interview would end any differently than all of his friends' interviews had ended, particularly since the officers told him midway through the interview that they wanted to wrap it up "and get you out of here."

Relying on *J.D.B. v. North Carolina* (2011) ___ U.S. ___ [131 S.Ct. 2394] (*J.D.B.*), Sample argues that his youthfulness heightened the significance of factors (such as the fake sketch and his inability to contact his mother) mitigating in favor of a finding of custody. In his reply brief, he suggests that his age might also warrant discounting those factors that would otherwise favor a finding that he was not in custody.

In *J.D.B.*, the United States Supreme Court held that the inclusion of a child's age in the custody analysis is "consistent with the objective nature of that test." (*J.D.B.*, *supra*, 131 S.Ct. at p. 2406.) But that is not to say, the court qualified, that "age will be a determinative, or even a significant, factor in every case." (*Ibid.*) In this case, we are convinced by the totality of the circumstances that Sample's age (16 and a half at the time

24

of the interview) was not a significant factor. We have listened to the audio recordings, and we agree with the trial court's assessment that the detectives conducted their entire encounter with Sample in a respectful, nonaggressive, and nonthreatening manner. The tone of the recordings is conversational throughout. Sample freely and even volubly responded to the officers' questions, and we detect no anxiety in his voice. The tone and tenor of the conversation did not change after the officers showed Sample the fake sketch. Although Sample told the officers he was "shocked" by the resemblance and that he had been worried about the sketch, he also calmly explained that there had to be someone else who looked like him, since nothing at all had happened when he and his friends were outside Torres's house that night. The trial court did not abuse its discretion in denying Sample's motion to suppress his December 6, 2006 statements.

### C. Cumulative Error

Sample complains that the cumulative effect of the asserted wiretap and *Miranda* errors denied him due process. Since we have found no error, his claim fails. (*People v. Cooper* (1991) 53 Cal.3d 771, 839.)

### D. Exclusion of "Substantial Portions" of Miller's Police Interview

Miller claims the exclusion of "substantial portions" of his December 13, 2006 police interview violated Evidence Code section 356 and his rights to present a complete defense, to confront witnesses, and to a fair trial.

#### 1. Background

Interviewed by police on the day of his arrest, Miller initially denied having been at Torres's house or downtown with him in January 2006. He eventually admitted taking "a very long walk" downtown with Torres and others to pick up an Xbox to sell. They walked to a house that Torres said was his mother's or his aunt's. Behind it was a "little shack thing" that Torres said was his room. They waited there for "about five minutes"

25

while Torres went into the house. The room "smelled," and when Torres came back, "we said we wanted to leave." Torres called someone about buying the Xbox "but they didn't wanna buy it no more."

In the second part of the interview, which followed a break in the questioning, Miller told police that he and his friends had walked "for a little bit" after leaving Torres's house "[a]nd then there was this guy and [Torres] ran up to him or something." Miller "was watching the whole time" as Torres beat the victim with a bat and Sample kicked or punched him. Torres and Flores went home, and Miller, Sample, and Garewal called Miller's brother for a ride and "got picked up at Wienerschnitzel's."

On learning that the People planned to introduce the first part of the interview, Miller moved in limine to admit the second part (Evid. Code, § 356), arguing that the "small and misleading" first part created the "clear" impression that he "was present" during the attack but was being "evasive" or "lying" to the police "about what occurred at this time and place and his role in those activities." Focusing on Miller's statement that after leaving Torres's house, the group went to the Wienerschnitzel and called Miller's brother for a ride, Miller's counsel argued that including that statement left "a gap" because "we are talking about a period of time when the implication is [that Miller] saw nothing." After the People agreed to redactions eliminating that gap, the court denied the motion.

On several subsequent occasions, Miller asked the court to admit the second part of the interview based on Evidence Code section 356, *Aranda-Bruton*,[4] and/or his right to effectively cross-examine Torres. The court denied those requests, and the audio recording of the first part of Miller's police interview was played for the jury.

_____

[4] *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).)

26

## 2.  Analysis

Miller contends that the second part of his police interview "had to be admitted" to dispel "the obvious inference that he had not only denied involvement but had denied being present" during the assault on Trujillo.  We disagree.

Evidence Code section 356 provides that "[w]here part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."  (Evid. Code, § 356.)  " 'The purpose of this section is to prevent the use of selected aspects of a conversation . . . , so as to create a misleading impression on the subjects addressed.  [Citation.]  Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which "have some bearing upon, or connection with, the admission . . . in evidence." ' "  (*People v. Williams* (2006) 40 Cal.4th 287, 319 (*Williams*).)  Parts of an interview that do not clarify or explain the parts that were admitted, however, may be excluded in the court's discretion.  (*Ibid.*; *People v. Williams* (1975) 13 Cal.3d 559, 565 [although hearsay is not a valid objection to the admission of parts of an interview under Evidence Code section 356, "[s]ection 356 is indisputably ' "subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced." ' [Citations.]"].)

Here, Miller's assertion in the second part of the interview that he merely watched Torres and Sample attack Trujillo had no " ' ' "bearing upon, or connection with," ' " his statement in the first part of the interview that he and others went to Torres's house to pick up an Xbox that Torres planned to sell.  (*Williams*, *supra*, 40 Cal.4th at p. 319.)  Although both statements arguably related to the same subject (broadly defined as

anything that happened in the vicinity of Torres's residence that January night), the second part of the interview was not "necessary to make [the first part of the interview] understood . . . ." (Evid. Code, § 356; *People v. Gambos* (1970) 5 Cal.App.3d 187, 192-193 (*Gambos*).) The time gap that Miller claimed made the first part of the interview "misleading" had been eliminated by redaction, and the first part of the interview as redacted was independently comprehensible. (See *People v. Barrick* (1982) 33 Cal.3d 115, 131 & fn. 4 (*Barrick*) [post-arrest statement would have been admissible if necessary to understand earlier pre-arrest statement, but earlier statement was found independently comprehensible], superseded by statute on another ground as stated in *People v. Collins* (1986) 42 Cal.3d 378, 393; see also *People v. Farley* (2009) 46 Cal.4th 1053, 1103 (*Farley*) ["the trial court did not abuse its discretion in concluding that the proffered letters were not 'necessary' to the jury's understanding of the letters introduced by the prosecution . . . [but were instead] 'independently comprehensible' on the relevant topics of defendant's premeditation and intent to kill."].) Accordingly, the trial court did not abuse its discretion in excluding the second part of Miller's interview as unnecessary to make the first part of the interview understood.[5] (Evid. Code, § 356.)

Miller next argues that the second part of the interview was necessary to make Ferrante's testimony about a recorded telephone call (in which Miller and Sample discussed the police sketch) understood—i.e., to dispel an inference that Miller *never* denied involvement in the attack. We disagree. The colloquy was not misleading because the question was plainly limited to that particular recorded telephone conversation: "And neither one of the individuals *in that phone call*, either Eddie Sample

---

[5]     Our conclusion makes it unnecessary for us to address Miller's further argument that because the *second* part of his interview "could not have been redacted [as required by *Aranda-Bruton*]" without making it appear that he was "falsely" trying to exonerate Sample, the trial court should have excluded the entire interview or severed his and Sample's trials. The *Aranda-Bruton* redactions to the *first* part of the interview created no such problems.

or Daniel Miller, ever denied being involved in the murder?" (Italics added.) "*Not in the phone call*, no," Ferrante responded. (Italics added.) Because the question and answer were independently comprehensible, the second part of Miller's interview was not necessary to clarify or explain them. (See *Barrick*, *supra*, 33 Cal.3d at p. 131 & fn. 4; *Farley*, *supra*, 46 Cal.4th at p. 1103.)

Miller next argues that the court's "repeated rulings" violated his constitutional right to present a complete defense and denied him a fair trial by "preventing [him] from dispelling the innuendos that he had lied to the police and that he was protecting his co-defendant." The argument lacks merit. There were no innuendoes to dispel once the first part of the interview was redacted—the misleading time gap had been eliminated, only Miller and Torres were referred to by name, and pronouns and other neutral terms (e.g., "you guys") were used to refer to the entire group or some subset of the five present that night.

Miller next argues that the exclusion of the second part of the interview denied him due process. We reject the contention. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; *People v. Lucas* (1995) 12 Cal.4th 415, 464-465 (*Lucas*) [rejecting claim that the exclusion of hearsay evidence amounted to a denial of due process].) Here, there was no basis for admission of the second part of Miller's interview. As previously discussed, it was not admissible under Evidence Code section 356 because the first part of the interview was independently comprehensible. (See *Barrick*, *supra*, 33 Cal.3d at p. 131 & fn. 4; *Farley*, *supra*, 46 Cal.4th at p. 1103.) With Evidence Code section 356 unavailable as a basis for admission, the second part of the interview was hearsay to which no exception applied. (Evid. Code, § 1200; see *Gambos*, *supra*, 5 Cal.App.3d at p. 192.) As such, it was properly excluded. Defendant's due process rights were not violated by exclusion of the second part of the interview. (*Lucas*, at pp. 464-465; see *People v.*

*Gurule* (2002) 28 Cal.4th 557, 605 ["The 'fuller picture' defendant argues should have been presented to the jury consisted of self-serving hearsay not otherwise admissible at trial. [Citation.] Defendant was free to present this information by taking the stand himself."].)

Miller next contends that he was "prevented . . . from effectively cross-examining Torres by presenting the argument that [Torres] was lying and was implicating [Miller] only after the police had informed [Torres] that [Miller] had said that it was he, Torres, who had hit the victim with a bat." We disagree.

When Miller raised this issue below, Sample's counsel protested that admitting Miller's self-serving exculpatory assertion under the guise of effective cross-examination would violate *Sample*'s right to confrontation, because Miller's statement that Torres *and Sample* were the attackers would come in without Miller having to explain it on the stand. The trial court ruled that the defense would be permitted to cross-examine Torres about his motivations for changing his story, but Miller's counsel would not be permitted to get into the details of what Miller had told police about *his own* claimed lack of participation in the assault. "[B]ased on rulings I've previously made regarding the statements of both defendants, . . . *Aranda/Bruton* issues, Evidence Code 356 issues," the trial court explained, "I don't see this as an alternate avenue of getting before the jury [Miller's] self-serving obviously exculpatory statements. [¶] What the Court feels is relevant and probative is . . . [that] Mr. Torres testified on direct [that] he was aware that both defendants had implicated him in the assault . . . , and that that was a factor in his decision to give a statement to police and to testify. [¶] . . . [¶] So, I'm going to limit [the] defense to being able to ask questions using wording such as, 'implicated in the participation of the assault on Mr. Trujillo.' But nothing more than that."

Following this ruling, both defense counsel vigorously cross-examined Torres about his motivation for testifying, and Torres testified that he had been "tripped out" to learn "*that [Sample and Miller] were saying that I was the one that did it.*" (Italics

30

added.)  Miller's counsel emphasized this response:  "And in fact the information that you got from the police back in April is *that both the guys said that you did it*; is that correct?"  (Italics added.)  Torres responded affirmatively, and he was then thoroughly cross-examined on whether he knew that his murder charge carried a 25 years to life sentence, whether his lawyer had told him he "could be in there the rest of [his] life" since "people as a whole don't get paroled on that kind of a charge," whether he was worried about that, whether he was angry that Sample and Miller had "ratted" him out, and whether he wanted the murder charge against him dropped in exchange for his testimony.  In sum, Torres himself told the jury what Miller contends he was precluded from asking about.  Miller's assertion that "[a]ll the jury heard was that at some point Miller (and also Sample) had somehow implicated Torres in the beating" is simply incorrect.  Miller's right to effectively cross-examine Torres was not violated.

### E.  Exclusion of Sample's Post-Arrest Statements

#### 1.  Background

Miller moved in limine to admit a portion of Sample's post-arrest police interview in which Sample stated that he hit and kicked Trujillo in the ribs after Trujillo was on the ground; that Torres hit Trujillo with the bat; that Sample picked up the bat and ran with it; and that Sample did not recall Miller doing anything during the attack.  Miller argued that Sample's statements were admissible as declarations against Sample's penal interest (Evid. Code, § 1230).  It was undisputed that for purposes of Evidence Code section 1230, Sample was unavailable to testify.

The trial court denied Miller's motion, ruling that Sample's statements inculpating Torres and exculpating Miller were not against *Sample's* penal interest and that his statements about his own participation were not sufficiently reliable to warrant their admission "given the fact that [Sample] subsequently under oath [at the hearing on his motion to exclude his pre- and post-arrest statements to police] repudiated the entire

31

statement." The trial court cited Evidence Code section 352 as "an additional basis" for its ruling, explaining that although Sample's statements about his own participation were "extremely probative" of his own guilt, they had "little, if any, probative value" with respect to Miller's guilt. That minimal probative value was substantially outweighed by the probability that admission of the statements would necessitate an undue consumption of time by "at least arguably" requiring additional witnesses and testimony. The court noted that admission of the statements would also create a substantial danger of confusing the issues and misleading the jury.

## 2. Analysis

Miller claims the trial court should have admitted Sample's post-arrest statements as declarations against Sample's penal interests. We disagree.

Evidence Code section 1230 provides that "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).) "We review a trial court's decision as to whether a statement is against a defendant's penal interest for abuse of discretion." (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).

Evidence Code section 1230 does not permit admission of " 'any statement or portion of a statement not itself specifically disserving to the interests of the declarant,' " and it does not apply to " 'collateral assertions within declarations against penal interest.' " (*Duarte*, *supra*, 24 Cal.4th at p. 612, quoting *People v. Leach* (1975) 15 Cal.3d 419, 441 (*Leach*).) "[C]ollateral statements are not made trustworthy by proximity to

incriminating statements." (*Duarte*, at p. 617.) "Under the rule of *Leach*, a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' [Citations.]" (*Duarte*, at p. 612.) "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." (*Williamson v. U.S.* (1994) 512 U.S. 594, 599-600.) "Whether a statement is self-inculpatory or not can only be determined by viewing the statement in context." (*Lawley*, *supra*, 27 Cal.4th at p. 153.)

Here, Sample's statement that he "hit and kicked" Trujillo was inculpatory and specifically disserving of his penal interests because it implicated him in the fatal attack. (*Duarte*, *supra*, 24 Cal.4th at p. 611.) The same cannot be said about Sample's other statements, which seem to have been aimed at exculpating himself and Miller by shifting the blame to Torres. Sample did not admit inflicting any unquestionably fatal blows, and his statements that he picked up the bat after the attack and ran with it and that he could not recall Miller doing anything seem calculated to bolster the claim that it was Torres, rather than Sample or Miller, who killed Trujillo. Sample's minimization of his own role in the beating and the mere suggestion that Miller might not have participated render Sample's statements untrustworthy—a conclusion greatly bolstered by Sample's later admission under oath that all of his earlier statements were lies. Exclusion of the statements was not an abuse of discretion. (*Duarte*, at p. 612.)

Miller claims the trial court's overly strict interpretation of the Evidence Code violated his due process rights to a fair trial and to present a complete defense. The Attorney General counters that Miller forfeited the issue by failing to raise it below. Even assuming that Miller preserved his claim, it lacks merit.

33

The proper application of Evidence Code section 1230 did not violate Miller's due process rights. The excluded statements were hearsay to which no exception applied. (Evid. Code, § 1200; *Duarte*, *supra*, 24 Cal.4th at p. 610.) Sample had, moreover, declared under oath that he was lying when he made those statements. The statements were also flatly contradicted by Neri's eyewitness identification of Sample as the bat-wielding attacker and Miller as the attacker on the bicycle, by Torres's eyewitness testimony, and by the absence of any evidence (apart from Sample's and Miller's self-serving statements to police) that Torres had joined in the attack. Exclusion of Sample's admittedly untrustworthy statements did not deny Miller due process. (*Lucas*, *supra*, 12 Cal.4th at pp. 464-465; *People v. Hall* (1986) 41 Cal.3d 826, 834-835.)

The cases Miller relies on do not compel a different conclusion. *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) and its progeny stand for the proposition that a state may not impede a defendant's right to put on a defense by applying evidentiary rules "mechanistically to defeat the ends of justice." (*Chambers*, at p. 302; *Green v. Georgia* (1979) 442 U.S. 95, 97 (*Green*); *Su Chia v. Cambra* (9th Cir. 2004) 360 F.3d 997.) They do not hold that a defendant must be allowed to present any evidence he chooses. In noting that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense," the *Chambers* court also declared that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers*, at p. 302.) In any event, the cases on which Miller relies are distinguishable. In all of them, the excluded evidence "bore persuasive assurances of trustworthiness." (*Ibid.*; *Green*, at p. 97 ["substantial reasons existed to assume [the] reliability" of the excluded evidence], *Su Chia v. Cambra*, at p. 1001.) Because that cannot be said here, those cases are inapposite.

Quoting *People v. Greenberger* (1997) 58 Cal.App.4th 298 (*Greenberger*), Miller argues that the trial court's application of Evidence Code section 352 as an alternate basis for its ruling was "not appropriate." We cannot agree.

In *Greenberger*, the court explained that when evidence "of significant probative value to one defendant" would be "substantially prejudicial to a codefendant," the remedy is not to exclude the evidence but instead, to give a limiting instruction or sever the cases. (*Greenberger*, *supra*, 58 Cal.App.4th at p. 351.) "In such a situation," the court noted, "'Evidence Code section 352 must bow to the due process right [of] a defendant to a fair trial and to his right to present all relevant evidence of significant probative value to the defense.'" (*Greenberger*, at p. 352.)

*Greenberger* is distinguishable. The trial court's Evidence Code section 352 ruling here was not based on undue prejudice but rather, on undue consumption of time and the substantial danger of confusing the issues and misleading the jury. Miller does not challenge those conclusions here.

## F. Alleged *Crawford* Error[6]

Defendants contend that the admission of Dr. Jordan's testimony violated their constitutional rights to confront the coroner who performed the autopsy on Trujillo's body.

### 1. Background

Former Santa Clara County Medical Examiner Dr. Christopher Happy conducted the January 27, 2006 autopsy on Trujillo's body. Dr. Happy moved to Wisconsin before trial and was unwilling to testify for the prosecution or the defense. In pretrial discussions, the prosecution informed the court that it would not call Dr. Happy or seek to offer his report or conclusions in evidence but would instead prove the cause of death

---

[6]    *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

"in an alternative manner"—i.e., through independent expert testimony. The prosecutor explained that another coroner, Dr. Jordan, would render her independent expert opinion based solely on the photographs that Schnutenhaus had taken during the autopsy. "So in essence we're eliminating the report, and she will render her opinion based upon those photographs." The defense had been informed that Dr. Jordan's opinion would be "consistent" with Dr. Happy's conclusion that the cause of death was blunt force trauma to the head, but would "deviate" from Dr. Happy's conclusion that tasing was a contributory cause of the death.

The court noted, and defense counsel confirmed, that Dr. Happy was on the defense witness list. Several weeks later, however, the defense had informed the court that they did not intend "to bring Dr. Happy back here." Defendants then moved in limine to exclude Dr. Jordan's testimony, arguing that cause-of-death testimony by a pathologist who did not attend the autopsy violated their Sixth Amendment rights to confront Dr. Happy. Dr. Jordan was "not really an independent reviewer," they contended, since she had read Dr. Happy's report and was "tainted by the observations and evaluations of the examining coroner." Because Dr. Jordan's proposed testimony was "'testimonial' and unavoidably tainted," its admission without a prior opportunity to cross-examine Dr. Happy, who had not been shown to be unavailable, would violate defendants' confrontation rights. Thus, *Crawford* and *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*) required that she not be permitted to testify.

After extensive argument, the trial court ruled that Dr. Jordan would be permitted to render her independent opinion based on Schnutenhaus's photographs. Dr. Happy's report would not be admitted without a stipulation by the parties. The defense would be permitted to cross-examine Dr. Jordan "about her knowledge of and her opinion regarding the tasing, and what she feels about that," but neither side would be permitted to ask her about Dr. Happy's opinions.

At trial, Schnutenhaus authenticated the photos, and they were admitted without objection. Dr. Jordan testified that she would be "comfortable" disregarding the inadmissible autopsy report and rendering her opinion based on the photographs. After describing Trujillo's injuries for the jury, she opined that Trujillo died from blunt force trauma to the head caused by an assault and that he could not have survived his injuries. Dr. Jordan also opined that tasing had "nothing to do with" Trujillo's death. Taser darts must puncture the skin to be effective, and she saw no evidence of that. Additionally, neither Trujillo's medical records nor "E.K.G. studies that were performed continuously over a 24-hour period" revealed any evidence of cardiac arrhythmia, which is cited as a cause of death in the literature on this "very controversial issue in forensic pathology."

## 2. Analysis

Defendants contend that Dr. Jordan's testimony about the cause of Trujillo's death violated their Sixth Amendment right to confront Dr. Happy. Relying on *Crawford*, *Melendez-Diaz*, and *Bullcoming v. New Mexico* (2011) ___ U.S. ___ [131 S.Ct. 2705] (*Bullcoming*), they assert that "there can be little doubt that Dr. Happy's autopsy report was testimonial." "Because the report was testimonial, and there was no showing that [Dr. Happy] was unavailable to testify at trial or that [defendants] had a prior opportunity to cross-examine him, [defendants were] entitled to be confronted with him at trial." "Thus," defendants conclude, "the admission of Dr. Jordan's testimony violated [their] right of confrontation." We disagree.

"The Sixth Amendment's Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford*, *supra*, 541 U.S. at p. 42.) In *Crawford,* the United States Supreme Court held that the admission of the "testimonial" statement of a witness who is not subject to cross-examination at trial violates the defendant's right to confrontation unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id.* at pp. 53-54, 68-69.) The court explained that a testimonial

statement is " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " (*Id*. at p. 51.) Because the witness's "recorded statement" in *Crawford*, which was "knowingly given in response to structured police questioning," qualified as testimonial "under any conceivable definition," its admission without a prior opportunity for cross-examination violated the Confrontation Clause. (*Id*. at pp. 53, fn. 4, 68-69.)

In *Melendez-Diaz*, the court held that forensic laboratory certificates attesting that the substance seized from the defendant was cocaine fell "within the 'core class of testimonial statements' " described in *Crawford*, and admission of the certificates without any showing that the analysts who performed the testing were unavailable to testify at trial and that the defendant had a prior opportunity to cross-examine them violated the Confrontation Clause. (*Melendez-Diaz, supra*, 557 U.S. at pp. 310-311.) In *Bullcoming*, the court held that the introduction of a blood-alcohol analysis report through the "surrogate testimony" of a forensic analyst "who did not sign the certification or perform or observe the test reported in the certification" violated the defendant's right to confrontation. (*Bullcoming, supra*, 131 S.Ct. at pp. 2709-2710.)

The facts of this case are quite different. This is not a case in which a particular witness's accusatory evidence was *admitted* without the witness's testimony, as occurred in *Crawford* and *Melendez-Diaz*. (*Crawford, supra*, 541 U.S. at p. 38; *Melendez-Diaz, supra*, 557 U.S. at p. 309.) Nor is this a case in which a witness's accusatory evidence was admitted through the testimony of a surrogate witness, as was the case in *Bullcoming*. (*Bullcoming, supra*, 131 S.Ct. at p. 2719.) Here, unlike in those cases, the prosecution never sought to introduce the autopsy report in evidence, and the trial court *excluded* any mention of Dr. Happy's opinions.

Nor do defendants claim that Dr. Jordan was a surrogate witness for Dr. Happy. Indeed, they assert the opposite: that her testimony "differed from the opinion of [Dr. Happy]" because she concluded that tasing was *not* a contributory cause of Trujillo's

38

death. Thus, even if we were to assume for purposes of argument that the autopsy report and Dr. Happy's opinions were "testimonial" for purposes of *Crawford*, they could not have triggered defendants' right to confrontation in this case, because they were never presented to the jury. It is not the mere existence of a "testimonial" statement that gives rise to the right of confrontation but rather, its use against the defendant. (See *Bullcoming*, *supra*, 131 S.Ct. at p. 2716 ["In short, when the State elected to introduce Caylor's certification, Caylor became a witness Bullcoming had the right to confront."].) Sample and Miller were not "entitled to be confronted with [Dr. Happy] at trial" because he was not a witness against them.

Here, the only cause-of-death testimony that defendants were confronted with was Dr. Jordan's testimony. Defendants acknowledge that "Dr. Jordan did not rely on Dr. Happy's autopsy report," and it is apparent to us from the record that her opinions were based solely on the photographs and on her review of Trujillo's medical records. Defendants do not argue that they were prevented from cross-examining Dr. Jordan about her opinions, nor do they deny that they were free to call their own experts, including Dr. Happy if they wished to call him, to refute Dr. Jordan's opinions. Defendants' confrontation rights were not violated.

## III. Disposition

The judgments are affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Márquez, J.

40